**FILED**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS MAR 3 1 2008
EASTERN DIVISION

3 - 31 - 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

LEROY LOUDERMILK, LML MONEY )
MANAGEMENT CORP., and )
NASHVILLE PARTNERS FUND, LLC, )
)
Plaintiffs, )
)    08CV1839
)    JUDGE HART
v. )    MAG. JUDGE NOLAN
)
GREENBERG TRAURIG, LLP, )
)
Defendant. )

## COMPLAINT

Plaintiffs, LEROY LOUDERMILK, LML MONEY MANAGEMENT CORP., and

NASHVILLE PARTNERS FUND, LLC, by their attorneys, for their Complaint against

Defendant, GREENBERG TRAURIG, LLP, state as follows:

## NATURE OF THE ACTION

1.    Plaintiffs bring this claim for breach of fiduciary duty, fraud, negligent

misrepresentation, breach of contract and professional malpractice against Defendant, Greenberg

Traurig, LLP for its conduct in promoting an unlawful and unregistered tax shelter, and

negligently developing, creating and implementing a charitable remainder trust.

## PARTIES

2.    Leroy Loudermilk ("Lee") is a citizen of Indiana and resides in Valparaiso,

Indiana.

3.    LML Money Management Corp. ("LML") is an Illinois corporation that

maintains its principal place of business in Homewood, Illinois.

4.    Nashville Partners Fund, LLC ("NPF") is a Delaware limited liability company that maintains its principal place of business in Homewood, Illinois. Lee holds a 99% interest in NPF and LML owns the remaining 1% interest in NPF.

5.    Greenberg Traurig, LLP ("GT") is a New York limited liability partnership with two partners, Greenberg Traurig of New York, P.C., a New York professional corporation, and Greenberg Traurig, P.A., a Florida professional association. Greenberg Traurig of New York, P.C. has its principal place of business in New York, and Greenberg Traurig, P.A. has its principal place of business in Florida. Although GT is authorized to transact business in Illinois, neither of its two partners are citizens of Illinois for diversity purposes. At all times relevant to this Complaint, GT served as Lee's, LML's, and NPF's lawyers.

## JURISDICTION AND VENUE

6.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

7.    Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claim occurred in the Northern District of Illinois.

## FACTUAL ALLEGATIONS

**Background**

8.    Prior to January 2001, Lee was the owner of Midwest Fastener Corp., an Illinois corporation ("MFC"). In January 2001, Lee sold his interest in MFC, which sale resulted in a taxable gain to Lee of over $37 million (the "Sale Transaction").

9.    Following this sale, American National Bank (predecessor to Bank One, which is the predecessor to JP Morgan Chase) (the "Bank") solicited Lee to enter into a series of

2

transactions designed to generate losses to offset this gain (the "Tax Shelter Transactions" as defined below and the "Trust" as defined below). The Bank recommended that Lee use GT as his counsel in connection with the Tax Shelter Transactions.

10.     On or about July 19, 2001, GT and Lee entered into a written engagement agreement under which GT would provide advice regarding the Tax Shelter Transactions (the "Tax Shelter Engagement Letter"). In the Tax Shelter Engagement Letter, GT claims a "...special expertise in securities transactions, including hedge funds and foreign currency contracts and derivatives...." The Tax Shelter Engagement Letter provides that GT will (a) assist in structuring the Tax Shelter Transactions; (b) render an opinion as to its Federal income tax consequences; and (c) provide defense in any administrative proceeding. A true and correct copy of the Tax Shelter Engagement Letter is attached hereto as Ex. 1.

11.     GT acknowledged in the Tax Shelter Engagement Agreement that it had certain fiduciary obligations to Lee, including but not limited to the duty to avoid certain conflicts in its representation of Lee. GT also acknowledged the duty to inform Lee of any conflicts that may arise during the course of the representation. In violation of its express acknowledgement of these duties, GT failed to inform the Plaintiffs of its relationship with the Bank and Bricolage Management Inc. ("Bricolage") and failed to inform the Plaintiffs that GT accepted payments from the Bank for referring clients to similar tax shelter strategies.

12.     Subsequently, on or about October 1, 2001, Lee engaged GT to develop, create and implement a Charitable Remainder Uni-Trust (the "Trust"), recommended by the Bank as an additional tax savings device to manage his gain on the sale of MFC.

13.     Lee had no prior relationship with GT and would not have used their legal services but for the recommendation of the Bank.

3

14.     Lee met with attorneys from GT on only one occasion and was accompanied by representatives of the Bank. Thereafter all communications regarding the organization of the tax shelter, the drafting of the Opinion Letter, the drafting of the Trust, and the collection of GT's fees relating to the Tax Shelter Transactions, were directed through personnel of the Bank.

15.     GT cooperated with the Bank and several other tax shelter promoters to market and sell tax shelters to wealthy individuals, including the tax shelter sold to Lee. Jay I. Gordon ("Gordon"), a partner at GT, received on the firm's behalf payments from tax shelter promoters, including the Bank, for referring clients to the tax shelter promoters. The acceptance of those payments, and the prospect of disciplinary action against Gordon, led to Gordon's resignation from GT and from the New York bar. Gordon's resignation was approved by the Departmental Disciplinary Committee of the Supreme Court of the State of New York, Appellate Division, First Judicial Department.

## The Tax Shelter Transactions

16.     The Tax Shelter Transactions involved the purchase of offsetting foreign currency derivative positions by Nairobi II Partners Fund, LLC ("Nairobi II"). At the time of formation, Nairobi II was owned 99% by Nairobi Partners Fund, LLC ("Nairobi") and 1% by Delta Currency Management Company ("Delta"). At the time of formation, Nairobi was owned 99% by NPF and 1% by Delta. After a series of transactions undertaken following its formation but prior to Lee's involvement, NPF was owned 99% by two limited liability companies owned, in turn, by two individuals (the "NPF Initial Members") and 1% by Bricolage.

17.     While the membership interests in NPF, Nairobi and Nairobi II were owned in accordance with the initial structure, Nairobi II invested approximately $316,910 in various foreign currency derivative contracts. The investments of Nairobi II in a portion of the currency

4

derivative contracts generated taxable gains, net of losses and deductions of approximately $45,924,000 prior to August 31, 2001, and the cash generated by these gains was then invested in various certificates of deposit which totaled approximately $45,930,000 as of such date. On August 31, 2001, Nairobi II also held loss positions of approximately $45,930,000 in the remaining currency derivative contracts in its portfolio.

18.     As of August 31, 2001, Lee purchased 99% of the membership interests in NPF from the NPF Initial Members, and formed LML that purchased the remaining 1% membership interest from Bricolage. The total purchase price for all of the membership interests was $1,826,760.87. Lee contributed an additional $30,356,571.70 to NPF between August 31, 2001 and January 1, 2002. The contribution of assets to NPF was necessary to the Tax Shelter Transactions as otherwise Lee would not have had insufficient basis against which to claim the losses.

19.     On October 1, 2001, Nairobi sold its 99% membership interest in Nairobi II to unrelated parties for the amount of $297,388.32. Delta retained its 1% interest. As a result of Nairobi's sale of its 99% membership interest in Nairobi II for an aggregate price of $297,388.32, Nairobi claimed a loss of $31,584,469. The loss was allocated 99% to NPF and 1% to Delta. NPF's allocated portion of Nairobi's loss was then allocated 99% to Lee, individually, and 1% to LML. LML's portion of the loss was allocated 100% to Lee.

20.     GT represented to Lee that the proposed currency transactions, the purchase of his membership interests in NPF and the related sale of the Nairobi II interest at a loss by Nairobi (collectively, the "Tax Shelter Transactions"), would permit Lee to claim 99% of the "loss" realized by Nairobi on his 2001 income tax returns. By claiming the loss realized by Nairobi, GT represented that Lee could effectively defer taxation of Lee's gain from the Sale Transaction.

5

**GT's Misrepresentations to Plaintiffs**

21.     GT knew or should have known that the above transactions constituted a tax shelter within the meaning of Code Section 6111(c)(1), and, therefore, that it was illegally promoting an unregistered tax shelter. Despite this, on March 7, 2002, GT issued an opinion letter to Lee (the "Opinion Letter") giving its approval to the Tax Shelter Transaction and representing that more likely than not it would be respected for federal income tax purposes.

22.     On information and belief, GT and Gordon had previously prepared form opinion letters approving transactions similar to the Tax Shelter Transactions for other clients and needed only to fill in certain blanks for each of the many clients to which they rendered such opinion letters.

23.     In the Opinion Letter, GT represented to Plaintiffs that Lee's and LML's investment in NPF and NPF's investments in the currency derivative contracts will have "real economic consequences and have a potential for substantial profits." GT further represented that the Tax Shelter Transaction "...had a reasonable possibility of producing substantial profits in excess of all costs and fees incurred in connection therewith...." This representation was made after all of the option contracts were closed and it was known that the economic consequences of the offsetting contracts were negligible or nonexistent.

24.     GT also represented to Plaintiffs that "no predetermined tax result will transpire from trading in the [currency derivative contracts]." GT was well aware of the marketing of the Tax Shelter Transactions in which the tax benefits were promoted and no mention was made of any potential for economic gain or loss. Moreover, GT was aware that the fees of the Bank and Bricolage were based solely on the amount of the projected tax loss.

25.     GT opined that "it [was] more likely than not" that the losses generated by the Tax Shelter Transactions could be properly claimed by Lee as a capital loss on his 2001 tax return to offset the gain realized from the sale of MFC.

26.     On December 27, 1999, the Internal Revenue Service, (the "IRS") published IRS Notice 1999-59, entitled "Tax Avoidance Using Distribution of Encumbered Property." In that notice, the IRS stated that:

> [t]he Internal Revenue Service and Treasury Department have become aware of certain types of transactions, as described below, that are being marketed to taxpayers for the purpose of generating tax losses. This notice is being issued to alert taxpayers and their representatives that the purported losses arising from such transactions are not properly allowable for federal income tax purpose …. Through a contrived series of steps, taxpayers claim losses for capital outlays that they have in fact recovered. Such artificial losses are not allowable for federal income tax purposes.

27.     IRS Notice 1999-59 referenced transactions substantially similar to the Tax Shelter Transactions involved here. As a result of Notice 1999-59, which was published well in advance of the Opinion Letter written by GT, GT knew or should have know at the time it issued its Opinion Letter to Plaintiffs that the purported losses arising from the Tax Shelter Transactions were not properly allowable for federal or state income tax purposes.

28.     Further, GT never corrected its prior Opinion Letter by advising Plaintiffs of Notice 1999-59 and its effect on the Tax Shelter Transactions as was its duty.

29.     Additionally, on September 5, 2000, the IRS published Notice 2000-44, entitled "Tax Avoidance Using Artificially High Basis." That Notice concerned "similar transactions [to those described in Notice 1999-59] that purported to generate tax losses for taxpayers." Notice 2000-44, which referenced transactions substantially similar to the Tax Shelter Transactions involved here and the IRS again stated that:

> [t]he purported loses from these transactions (and from any similar arrangements designed to produce noneconomic tax losses by artificially overstating basis in

partnership interests) are not allowable as deduction fro federal income tax purposes.

30.     As a result of Notice 2000-44, which was published well in advance of the Opinion Letter written by GT, GT knew or should have know at the time it issued its Opinion Letter to Plaintiffs that the purported losses arising from the Tax Shelter Transactions were not properly allowable for federal or state income tax purposes, yet GT offers only a cursory discussion of the Notice and minimized its significance. Notice 2000-44 is even clearer than Notice 1999-59 in stating that, with regard to any similar transactions to those described in the Notices, the non-economic losses produced by such transactions would not be allowable as a deduction. Therefore, there could have been no doubt on the part of GT that the losses generated by the Tax Shelter Transactions here would not be allowable deductions, despite what it falsely represented in its Opinion Letter.

31.     Further, GT never corrected its prior Opinion Letter by advising Plaintiffs of the true effect of Notice 2000-44 and its relevance to the Tax Shelter Transactions as was its duty.

32.     On July 2, 2002, the IRS published Notice 2002-50 in which it announced that all losses from transactions similar to the Tax Shelter Transactions would be disallowed as a deduction, as would all fees paid with respect to such transactions. The transactions described in Notice 2002-50 are identical in all relevant aspects to the Tax Shelter Transactions.

33.     GT failed to inform Plaintiffs of the issuance of Notice 2002-50 and the effect of its issuance on the opinions set forth in its Opinion Letter. GT failed to advise Plaintiffs to prepare and file their tax returns (or amended tax returns) in a manner consistent with 2002-50. GT never retracted its advice or representations to Plaintiffs regarding the propriety of the Tax Shelter Transactions.

34.     GT had a duty to inform Plaintiffs of the change in the law since it agreed to continuing representation of Lee following the issuance of the Opinion Letter. For that continuing representation, GT accepted and never returned $20,000 it received in payment specifically for its continuing representation. The $20,000 fee was paid to GT by the Bank.

35.     GT lured Plaintiffs into the Tax Shelter Transactions when it knew or should have known it to be an unlawful and unregistered tax shelter which would not be recognized by the IRS for tax purposes.

36.     Plaintiffs relied on its long standing relationship of trust with the Bank, the Bank's recommendation of GT, and GT's misrepresentations in its Opinion Letter in entering into the Tax Shelter Transactions. Because of GT's misrepresentations, Plaintiffs have suffered considerable economic loss.

**Defendant's Negligence in Drafting the Trust Agreement**

37.     On or about November 1, 2001, GT prepared for NPF a certain Trust Agreement. Lee signed the Agreement on behalf of NPF as grantor. The Trust Agreement, which is a charitable remainder unitrust ("Trust"), provides that NPF is to receive each year (on December 31) a unitrust payment equal to the lesser of the net income of the Trust for the taxable year and 11.5% of the net fair market value of the assets of the Trust as of the first business day of the year. If, in any taxable year, the trust income exceeds 11.5%, Lee will also be paid the excess income to the extent that the aggregate amounts previously received by Lee were less than the aggregate amounts computed using the 11.5% payout rate. Any assets remaining in the Trust as of the end of the Trust's term must be distributed to a charitable beneficiary. This type of charitable remainder unitrust is called a net income make-up charitable remainder uni-trust, or "NIMCRUT." Importantly, under the terms of the Trust capital gains are not treated as income

9

of the Trust. The Trust has a 20 year term. The Trust document as prepared by GT designates Opportunity Enterprises, Inc., of Valparaiso, Indiana, as the charitable beneficiary. NPF, as grantor, retains the right to replace the charitable beneficiary prior to the end of the term of the Trust. In no event can distributions be made which would reduce the remainder charity's interest to less than 10% of the original value of the Trust ($1,928,023).

38.     On or about November 1, 2001, NPF contributed assets to the Trust having a value of $19,280,228. NPF reported charitable contributions of $1,928,023 on its tax return for 2001, and Lee took a charitable deduction on his income tax return for 2001 equal to his allocable share of NPF's charitable contributions.

39.     Lee understood, from what he had been told by GT, that he would be deferring the income distributions in the early years of the Trust but that he would get back at least approximately 90% of the value of the assets contributed to the Trust during the term of the Trust and that the charity would get approximately 10% of the value of the assets contributed to the Trust at the end of the term, which was satisfactory to Lee and to NPF.

40.     If NPF and Lee had been advised that they would not get back at least approximately 90% of the value of the assets contributed to the Trust, they would not have agreed to a NIMCRUT.

41.     Additionally, GT represented to Plaintiffs that the Trust would be drafted to pay NPF, on an annual basis, the greater of the Trust's income or 11.5% of the value of the trust as of the end of the preceding year. Instead, the Trust was erroneously drafted in such a manner as to generate for NPF the lesser of the trust's income or 11.5% of the value of the trust as of the end of the preceding year.

10

42.     Under the terms of the Trust, as drafted, there is almost no possible way that Lee would get back 90% of the value of the assets contributed to the Trust over its term. Lee contributed to the Trust a 99% limited partnership interest in LML having a value of $19,280,228. The Trust's basis in the limited partnership immediately after the contribution was $19,280,228. Unless the assets held by the limited partnership (and therefore, the Trust's interest in the limited partnership) appreciate substantially, there would be no capital gains upon their sale. (There is currently a loss in the value of the assets.) In any event, even if the assets do appreciate, by the terms of the Trust, capital gains are not part of income and can, therefore, never be part of the payout to Lee, so that the makeup provision is meaningless unless the ordinary income of the Trust exceeds 11.5% in a particular year.

43.     In deciding whether to contribute $19,280,228 to the Trust, Lee and NPF relied upon the advice and representations given by GT.

44.     Lee has fully paid all legal bills due under his agreement with GT. None of the Plaintiffs has any financial or other obligation to GT.

### Count I – Breach of Fiduciary Duty – Tax Shelter Transaction

45.     Plaintiffs repeat and reallege each and every prior allegation in Paragraphs 1 through 44, inclusive, as if fully set forth herein.

46.     GT, as Plaintiff's attorneys, was Plaintiffs' fiduciary and thus owed Plaintiffs the duty of honesty, loyalty, care and compliance with the applicable codes of professional responsibility. GT acknowledges its duties to Plaintiffs by its references to the Rules of "Professional Responsibility Governing the New York Bar" in the Tax Shelter Engagement Letter. Moreover, GT specifically acknowledges its duties with respect to conflicts of interest in the same letter

11

47.    GT breached these duties by fraudulently inducing Plaintiffs to enter into the Tax Shelter Transactions in reliance on GT's Opinion Letter which GT knew or should have known to be false and which was for the sole purpose of generating huge fees for GT.

48.    As a result of GT's conduct as set forth herein, Plaintiffs have suffered injury, including, but not limited to: Lee paid the sum of $100,000 to GT for its advice related to the Tax Shelter Transactions and the Opinion Letter; Lee and NPF paid $1,455,935 in fees and costs associated with the Tax Shelter Transactions to the Bank, Delta, Bricolage, and other parties associated with Bricolage; Lee paid the sum of $632,307 in penalties to the IRS related to the Tax Shelter Transactions; Lee paid the sum of approximately $2,723,585 in interest to the IRS related to the Tax Shelter Transactions; Lee paid approximately $286,000 to the IRS to settle another matter, the settlement of which the IRS made a condition of its settling the Lee's liability related to the reporting of the Tax Shelter Transactions; and Lee, NPF and LML have incurred in excess of $325,000 in additional legal and accounting fees related to the IRS' examination and settlement of the Tax Shelter Transactions.

49.    As a direct and proximate cause of the foregoing, Plaintiffs have been injured in an amount in excess of $5.5 Million, and should be awarded punitive damages of $5 Million.

### Count II – Breach of Fiduciary Duty - Trust

50.    Plaintiffs repeat and reallege each and every prior allegation in Paragraphs 1 through 44, inclusive, as if fully set forth herein.

51.    GT, as Plaintiff's attorneys, was Plaintiffs' fiduciary and thus owed Plaintiffs the duty of honesty, loyalty, care and compliance with the applicable codes of professional responsibility. GT acknowledges its duties to Plaintiffs by its references to the Rules of "Professional Responsibility Governing the New York Bar" in the Tax Shelter Engagement

12

Letter. Moreover, GT specifically acknowledges its duties with respect to conflicts of interest in the same letter.

52.   GT breached these duties by erroneously drafting the Trust with substantially different provisions and effect than how GT told Plaintiffs they would draft the Trust, for the sole purpose of generating huge fees for GT.

53.   As a result of GT's conduct as set forth herein, Plaintiffs have suffered injury, including, but not limited to: Lee paid GT the sum of $20,000 for its advice and its preparation of the documents for the Trust; NPF contributed assets to the Trust of which at least $1,928,023 cannot be recovered from the Trust; and Lee, NPF and LML have and will incur legal and accounting fees related to the Trust in excess of $600,000 over the term of the Trust.

54.   As a direct and proximate cause of the foregoing, Plaintiffs have been injured in an amount in excess of $2.5 Million.

### Count III – Fraud – Tax Shelter Transaction

55.   Plaintiffs repeat and reallege each and every prior allegation in Paragraphs 1 through 44, inclusive, as if fully set forth herein.

56.   In order to induce Plaintiffs to pay them thousands of dollars of fees, GT made numerous knowingly false affirmative representations and intentional omissions of material fact to Plaintiffs, including: (1) the representation that the Tax Shelter Transactions would be recognized by the IRS for tax purposes; (2) failing to disclose existing published authority, including the Notices published by the IRS, which advised that losses such as those generated by the Tax Shelter Transactions would not be allowed; and (3) failing to advise Plaintiffs at a later time that the representations in their Opinion Letter were false.

57.   By its affirmative misrepresentations and intentional omission of material facts, Plaintiffs, in reasonable reliance on GT's said false representations and misleading omissions,

paid legal fees to GT for tax and legal advice, and entered into the Tax Shelter Transactions while failing to avail themselves of alternate legitimate tax savings opportunities.

58.    Upon discovering GT's fraud, Plaintiffs incurred and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation.

59.    As a result of GT's conduct as set forth herein, Plaintiffs have suffered injury, including, but not limited to: Lee paid the sum of $100,000 to GT for its advice related to the Tax Shelter Transactions and the Opinion Letter; Lee and NPF paid $1,455,935 in fees and costs associated with the Tax Shelter Transactions to the Bank, Delta, Bricolage, and other parties associated with Bricolage; Lee paid the sum of $632,307 in penalties to the IRS related to the Tax Shelter Transactions; Lee paid the sum of approximately $2,723,585 in interest to the IRS related to the Tax Shelter Transactions; Lee paid approximately $286,000 to the IRS to settle another matter, the settlement of which the IRS made a condition of its settling the Lee's liability related to the reporting of the Tax Shelter Transactions; and Lee, NPF and LML have incurred in excess of $325,000 in additional legal and accounting fees related to the IRS' examination and settlement of the Tax Shelter Transactions.

60.    As a proximate cause of the foregoing, Plaintiffs have been injured in an amount in excess of $5.5 Million, and should be awarded punitive damages of $5 Million.

### Count IV - Negligence/Negligent Misrepresentation/ Professional Malpractice – Tax Shelter Transaction

61.    Plaintiffs repeat, re-allege, and incorporate the allegations contained in Paragraphs 1 through 44 as if fully set forth herein.

62.    In its capacity as attorneys for Plaintiffs, GT was obligated to use such skill, prudence and diligence as well qualified members of the legal profession and were required to act with good faith and fidelity.

63.     During the course of its representation of Plaintiffs, GT made numerous negligently false affirmative representations and intentional or negligently misleading omissions of material facts to Plaintiffs including: (1) the representation that the Tax Shelter Transactions would be recognized by the IRS for tax purposes; (2) failing to disclose existing published authority, including the Notices published by the IRS, which advised that losses such as those generated by the Tax Shelter Transactions would not be allowed; (3) knowingly or negligently misrepresenting the effect of published guidance on the tax treatment of the Tax Shelter Transactions; and (4) failing to advise Plaintiffs at a later time that the representations in its Opinion Letter were false.  In providing this advice to Plaintiffs, GT failed to exercise the standard of care required by it as attorneys.

64.     Because GT knew that it was the intent and primary purpose of Plaintiffs to use the advice given to Plaintiffs by GT in deciding whether or not to enter into the Tax Shelter Transactions and reporting the Tax Shelter Transactions for federal and state income tax purposes, GT owed a duty to NPF to communicate accurate and correct information to Plaintiffs about the Tax Shelter Transactions.

65.     GT knew or reasonably should have known their advice to be false.

66.     In reasonable reliance on GT's said false representations and misleading omissions regarding the Tax Shelter Transactions, NPF paid legal fees to GT for tax and legal advice, and entered into the Tax Shelter Transactions while failing to avail themselves of alternate legitimate tax savings opportunities.

67.     NPF has suffered, and will continue to suffer severe economic loss as a direct and proximate result of GT's negligence and negligent misrepresentations.

68.     Upon discovering GT's fraud, Plaintiffs incurred and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation.

69.     As a result of GT's conduct as set forth herein, Plaintiffs have suffered injury, including, but not limited to: Lee paid the sum of $100,000 to GT for its advice related to the Tax Shelter Transactions and the Opinion Letter; Lee and NPF paid $1,455,935 in fees and costs associated with the Tax Shelter Transactions to the Bank, Delta, Bricolage, and other parties associated with Bricolage; Lee paid the sum of $632,307 in penalties to the IRS related to the Tax Shelter Transactions; Lee paid the sum of approximately $2,723,585 in interest to the IRS related to the Tax Shelter Transactions; Lee paid approximately $286,000 to the IRS to settle another matter, the settlement of which the IRS made a condition of its settling the Lee's liability related to the reporting of the Tax Shelter Transactions; and Lee, NPF and LML have incurred in excess of $325,000 in additional legal and accounting fees related to the IRS' examination and settlement of the Tax Shelter Transactions.

70.     As a proximate cause of the foregoing, Plaintiffs have been injured in an amount in excess of $5.5 Million, and should be awarded punitive damages of $5 Million.

### Count V - Negligence/Negligent Misrepresentation/Professional Malpractice - Trust

71.     Plaintiffs repeat, re-allege, and incorporate the allegations contained in Paragraphs 1 through 44 as if fully set forth herein.

72.     In its capacity as attorneys for Plaintiffs, GT was obligated to use such skill, prudence and diligence as well qualified members of the legal profession and were required to act with the most scrupulous good faith and fidelity.

73.     During the course of its representation of Plaintiffs, GT made numerous negligently false affirmative representations and intentional or negligently misleading omission of material facts to Plaintiffs, and committed professional negligence and malpractice, including:

16

(1) drafting the Trust in such a manner as to generate for NPF the lesser of the trust's income or 11.5% of the value of the trust as of the end of the preceding year; and (2) drafting the Trust in such a manner that it would never return at least approximately 90% of the value of the assets contributed to Plaintiffs, as GT had represented to Plaintiffs it would.

74.    Because GT knew that it was the intent and primary purpose of NPF to use the advice given to Lee by GT in order to make a $19,280,228 contribution to a trust vehicle, it owed a duty to communicate accurate and correct information to NPF about the trust vehicle it was recommending to be drafted and to draft the agreement in such a manner as to satisfy Lee's, LML's, and NPF's wishes and desires in connection with such a trust.

75.    GT knew or reasonably should have known their advice to be false

76.    In reasonable reliance on GT's said false representations and misleading omissions regarding the Trust, Lee, LML, and NPF justifiably and reasonably relied on GT's advice and drafting of the Trust in depositing $19,280,228 into the Trust, entered into the Trust while failing to avail themselves of alternate legitimate tax savings opportunities and paid legal fees to GT for tax and legal advice.

77.    Lee, LML, and NPF have suffered, and will continue to suffer, severe economic loss as a direct and proximate result of GT's negligence and negligent misrepresentations.

78.    Upon discovering GT's fraud, Plaintiffs incurred and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation.

79.    As a result of GT's conduct as set forth herein, Plaintiffs have suffered injury, including, but not limited to: Lee paid GT the sum of $20,000 for its advice and its preparation of the documents for the Trust; NPF contributed assets to the Trust of which at least $1,928,023

cannot be recovered from the Trust; and Lee, NPF and LML have and will incur legal and accounting fees related to the Trust in excess of $600,000 over the term of the Trust.

80.     As a proximate cause of the foregoing, Plaintiffs have been injured in an amount in excess of $2.5 Million.

## Count VI – Breach of Contract/Professional Malpractice – Tax Shelter Transaction

81.     Plaintiffs repeat, re-allege, and incorporate the allegations contained in Paragraphs 1 through 44 as if fully set forth herein.

82.     Plaintiffs entered into oral and written contracts with GT to provide Plaintiffs with professionally competent tax advice, legal services, to exercise the applicable standard of care, loyalty and honesty, and to comply with all applicable rules of professional conduct. The Tax Shelter Engagement Letter provides that GT will (a) assist in structuring the Tax Shelter Transaction; (b) render an opinion as to its Federal income tax consequences; and (c) provide defense in any administrative proceeding.

83.     GT acknowledges its duties to Plaintiffs by its references to the "Rules of Professional Responsibility Governing the New York Bar" in the Tax Shelter Engagement Letter.  GT specifically acknowledges its duties with respect to conflicts of interest in the same letter.

84.     In its capacity as attorneys for Plaintiffs, GT was obligated to use such skill, prudence and diligence as well qualified members of the legal profession and were required to act with the good faith and fidelity.

85.     Plaintiffs fully performed their obligations to GT under their contracts.

86.     GT ignored its obligations and instead provided Plaintiffs with advice that GT knew or should have known to be wrong in breach of the contracts between Plaintiffs and GT.

18

87.     Specifically, GT breached its contract with Plaintiffs and committed professional malpractice by: (1) representing that the Tax Shelter Transactions would be recognized by the IRS for tax purposes; (2) failing to disclose existing published authority, including the Notices published by the IRS, which advised that losses such as those generated by the Tax Shelter Transactions would not be allowed; (3) knowingly or negligently misrepresenting the effect of published guidance on the tax treatment of the Tax Shelter Transactions; and (4) failing to advise Plaintiffs at a later time that the representations in their Opinion Letter were false.

88.     GT knew or reasonably should have known their advice to be false.

89.     Upon information and belief, GT's Opinion Letter was a canned document used in part of a fee-generating scheme.

90.     As a result of GT's conduct as set forth herein, Plaintiffs have suffered injury, including, but not limited to: Lee paid the sum of $100,000 to GT for its advice related to the Tax Shelter Transactions and the Opinion Letter; Lee and NPF paid $1,455,935 in fees and costs associated with the Tax Shelter Transactions to the Bank, Delta, Bricolage, and other parties associated with Bricolage; Lee paid the sum of $632,307 in penalties to the IRS related to the Tax Shelter Transactions; Lee paid the sum of approximately $2,723,585 in interest to the IRS related to the Tax Shelter Transactions; Lee paid approximately $286,000 to the IRS to settle another matter, the settlement of which the IRS made a condition of its settling the Lee's liability related to the reporting of the Tax Shelter Transactions; and Lee, NPF and LML have incurred in excess of $325,000 in additional legal and accounting fees related to the IRS' examination and settlement of the Tax Shelter Transactions.

91.     As a direct and proximate cause of the foregoing, Plaintiffs have been injured in an amount in excess of $5.5 Million.

## Count VII – Breach of Contract/Professional Malpractice - Trust

92.    Plaintiffs repeat, re-allege, and incorporate the allegations contained in Paragraphs 1 through 44 as if fully set forth herein.

93.    Plaintiffs entered into oral and written contracts with GT to provide Plaintiffs with professionally competent tax advice, legal services, to exercise the applicable standard of care, loyalty and honesty, and to comply with all applicable rules of professional conduct.

94.    GT acknowledges its duties to Plaintiffs by its references to the "Rules of Professional Responsibility Governing the New York Bar" in the Tax Shelter Engagement Letter. GT specifically acknowledges its duties with respect to conflicts of interest in the same letter.

95.    In its capacity as attorneys for Plaintiffs, GT was obligated to use such skill, prudence and diligence as well qualified members of the legal profession and were required to act with good faith and fidelity.

96.    Plaintiffs fully performed their obligations to GT under their contracts.

97.    GT ignored its obligations and instead provided Plaintiffs with advice that GT knew or should have known to be wrong and misleading in breach of the contracts between Plaintiff and GT.

98.    Specifically, GT breached its contract with Plaintiffs, and committed professional malpractice by: (1) drafting the Trust in such a manner as to generate for NPF the lesser of the trust's income or 11.5% of the value of the trust as of the end of the preceding year; and (2) drafting the Trust in such a manner that it would never return at least approximately 90% of the value of the assets contributed to Plaintiffs, as GT had represented to Plaintiffs.

99.    GT knew or reasonably should have known their advice to be false.

100.    As a result of GT's conduct as set forth herein, Plaintiffs have suffered injury, including, but not limited to: Lee paid GT the sum of $20,000 for its advice and its preparation of the documents for the Trust; NPF contributed assets to the Trust of which at least $1,928,023 cannot be recovered from the Trust; and Lee, NPF and LML have and will incur legal and accounting fees related to the Trust in excess of $600,000 over the term of the Trust.

101.    As a direct and proximate cause of the foregoing, Plaintiffs have been injured in an amount in excess of $2.5 Million

WHEREFORE, Plaintiffs, Leroy Loudermilk, LML Money Management, Corp., and Nashville Partners Fund, LLC, respectfully request that this Court enter judgment in their favor and against Defendant, Greenberg Traurig, LLP, in an amount to be determined at trial, plus costs of suit and statutory interest, and award Plaintiffs any other and further relief that it deems just and equitable.

> LEROY LOUDERMILK,
> LML MONEY MANAGEMENT, CORP., and
> NASHVILLE PARTNERS FUND, LLC
>
>
> By:   /s Nathan H. Lichtenstein
>        One of their attorneys

Nathan H. Lichtenstein
Eric M. Brown
ARONBERG GOLDGEHN DAVIS & GARMISA
330 North Wabash Avenue
Chicago, Illinois 60611
312-828-9600
30375

475076.v2

21



**GREENBERG**

· A T T O R N E Y S   A T   L A W ·

**TRAURIG**

July 19, 2001

Mr. Lee Loudermilk
Fastener Equipment Corporation
17531 Ashland Avenue
Homewood, Illinois 60430

Dear Mr. Loudermilk:

I want to thank you on behalf of Greenberg Traurig, LLP for giving us the opportunity to represent you in connection with your investment in hedge funds and foreign currency transactions through Bricolage Capital, LLC and affiliates thereof ("Bricolage"). We value the relationship with you and will make every effort to satisfy you with prompt, thorough and efficient legal representation. Our firm's policy is to confirm in writing with our clients the scope and terms of our engagement. Please review this letter carefully and feel free to call with any questions.

### Engagement

You have retained us because of our special expertise in securities transactions, including hedge funds and foreign currency contracts and derivatives, to assist in structuring your investment through Bricolage. As part of our representation, we agree to advise and render our opinion as to the U.S. income tax consequences of your investment through Bricolage for all or any part of calendar year 2001 as you request. Subject to the limitations set forth herein, we also agree to defend you in any administrative proceedings with the Internal Revenue Service involving the subject matter of such opinion.

### Responsible Attorney

Customarily, each client of the firm is served by a principal attorney contact who is responsible for ensuring that you remain satisfied with all aspects of our representation. Although I will remain primarily responsible for this project, your work or parts of it may be performed by other lawyers and legal assistants under my general supervision. Such delegation may be for the purpose of involving lawyers and legal assistants with special expertise in a given area or for the purpose of providing services on the most efficient and timely basis.

GREENBERG TRAURIG, LLP
MET LIFE BUILDING
200 PARK AVENUE, NEW YORK, NEW YORK 10166
212-801-9200  FAX 212-801-6400  www.gtlaw.com

MIAMI  NEW YORK  WASHINGTON, D.C.  ATLANTA  PHILADELPHIA  TYSONS CORNER  CHICAGO  BOSTON  PHOENIX  WILMINGTON  LOS ANGELES  DENVER

Mr. Lee Loudermilk
July 19, 2001
Page 2


### Retainer and Fees

The fee for our services for calendar year 2001 shall be $100,000.00 (the "Base Fee"). You agree to pay to us $50,000 upon execution of this engagement letter and $50,000 upon delivery to you of the opinion referenced above.

As noted above, we agree to represent you before the Internal Revenue Service in any administrative proceeding relating to the subject matter of our opinion. We agree to incur fees and expenses at our normal hourly rates up to $20,000 for this purpose as part of the Base Fee set forth above. If and when normal hourly charges and expenses exceed $20,000, you will be notified and will be required to pay our normal hourly fees plus expenses for our continued representation. Attorney rates at this firm presently range from $150 to $500 per hour. My billing rate is $460 per hour. These rates are subject to change from time to time. During the course of this engagement, other shareholders, associates and contract attorneys of the firm may be called upon to provide assistance in order to best and most effectively represent your interests.

Although you may terminate this agreement at any time in accordance with the Rules of Professional Responsibility governing the New York Bar, if you terminate this agreement prior to paying us the Base Fee, you agree that we may retain the full amount of the fees theretofore paid to us without any refund for any payments in excess of normal hourly fees and disbursements incurred to that time. However, if you should terminate this agreement and have not at that time invested through Bricolage, we agree to refund the portion of the Base Fee that exceeds our normal hourly fees and disbursements incurred through and including the date of termination.

### Conflicts

Because we are a large, full-service law firm with offices located in New York, Denver, Philadelphia, Atlanta, Boston, Chicago, Los Angeles, Miami, Phoenix, Washington, D.C. and other cities in the United States, lawyers in one office or practice area may be asked to represent a client with respect to interests that are adverse to those of another client who is represented by the firm in connection with another matter. Just as you would not wish to be foreclosed in an appropriate situation from retaining a law firm that competes with Greenberg Traurig, our firm wishes to be able to consider the representation of multiple competitors in your industry or other clients who may have interests that are potentially adverse to yours but with respect to matters that are unrelated in any way to our representation of you. The ethics governing the legal profession permit law firms to accept such multiple representations assuming certain criteria are met as discussed below.

During the term of this engagement, we agree that we will not accept representation of another client to pursue interests that are directly adverse to your interests unless and until we have made full disclosure to you of all the relevant facts, circumstances and implications of our undertaking the two representations and you have consented to our representation of the other client. You agree, however, that you will be reasonable in evaluating such circumstances and that you will give your consent if we can confirm to you in good faith that the following criteria are met: (i) there is no substantial relationship between any matter in

Mr. Lee Loudermilk
July 19, 2001
Page 3

which we are representing or have represented you and the matter for the other client; (ii) our representation of the other client will not implicate any confidential information we have received from you; (iii) our effective representation of you and the discharge of our professional responsibilities to you will not be prejudiced by our representation of the other client; and (iv) the other client has also consented in writing based on our full disclosure of the relevant facts, circumstances and implications of our undertaking the two representations.

By making this agreement, we are establishing the criteria that will govern the exercise of your right under applicable ethical rules to withhold consent to our representation of another client whose interests are adverse to yours. You will retain the right, of course, to contest in good faith our representation that the criteria have been met, in which event we would have the burden of supporting our representations to you.

### Mutual Right to Terminate Relationship

Of course, every client has the right to terminate our representation at any time, subject to the terms provided herein. We have the same right upon giving the client reasonable notice so that suitable arrangements can be made by the client to obtain alternative representation, in accordance with the Rules of Professional Responsibility governing the New York Bar. Among the reasons for which we may terminate representation are: (1) nonpayment of our fees, charges or costs; (2) the client's failure or refusal to be forthright, cooperative or supportive of our efforts; (3) the client's misrepresentation of, refusal to represent or failure or refusal to disclose material facts; (4) the client's failure or refusal to accept our advice; (5) discovery of a conflict with another client of the Firm, or (6) any other reasons permitted or required under the Rules of Professional Responsibility governing the New York Bar.

Following termination by us, we will continue to provide representation in the matter for a reasonable time, at the client's request, until arrangements can be made for alternate representation. However, our services will consist of only those necessary to protect the client's interests and prevent prejudice. Upon termination, either by us or by the client, the client, upon request, must sign all papers and documents which we believe necessary for the firm to accomplish our withdrawal from the representation.

*     *     *     *     *

I hope that this letter provides you with a better understanding of the scope of our contemplated representation, as well as the fee structure of this firm for this matter. If the terms of the engagement are acceptable, please sign the acceptance below and return it to me. An additional copy of this letter is enclosed for your files.

Mr. Lee Loudermilk
July 19, 2001
Page 4


　　　　We truly appreciate both the opportunity to be of service to you and the trust and
confidence you have placed in us. We look forward to continuing a mutually beneficial
relationship over the years.

　　　　　　　　　　　　　　　Very truly yours,

　　　　　　　　　　　　　　　GREENBERG TRAURIG, LLP


　　　　　　　　　　　　By:_____
　　　　　　　　　　　　　　　Jay I. Gordon
　　　　　　　　　　　　　　　Shareholder

## ACCEPTANCE

The undersigned hereby agrees to retain, engage and employ Greenberg Traurig, LLP, as legal counsel, on the terms and conditions set forth in this letter.

Dated: May __, 2001

_L. Ll M_

Lee Loudermilk