IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LEROY LOUDERMILK, LML MONEY MANAGEMENT CORP., and NASHVILLE PARTNERS FUND, LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 08C 1839 |
| GREENBERG TRAURIG, LLP, | ) ) | Judge William T. Hart |
| Defendant. | ) ) ) ) | Magistrate Judge Nolan |

## DEFENDANT'S ANSWER TO PLAINTIFFS' COMPLAINT

Defendant GREENBERG TRAURIG, LLP ("Greenberg Traurig"), by and through its

attorneys, Jenner & Block LLP, hereby answers Plaintiffs' Complaint and asserts its affirmative

defenses as follows:

## NATURE OF THE ACTION

1.      Plaintiffs bring this claim for breach of fiduciary duty, fraud, negligent
misrepresentation, breach of contract and professional malpractice against Defendant
Greenberg Traurig, LLP for its conduct in promoting an unlawful and unregistered tax
shelter, and negligently developing, creating and implementing a charitable remainder trust.

**ANSWER:**      Greenberg Traurig admits that Plaintiffs attempt to bring this claim

for breach of fiduciary duty, fraud, negligent misrepresentation, breach of contract and

professional malpractice against Greenberg Traurig, but denies that Plaintiffs have a valid

claim and are entitled to any relief.  Greenberg Traurig denies that it promoted an unlawful

and unregistered tax shelter.  The remaining allegations in Paragraph 1 are legal conclusions

to which a response from Greenberg Traurig is neither necessary nor appropriate.  To the

extent that an answer is required, Greenberg Traurig denies any remaining allegations of fact

in Paragraph 1.

## PARTIES

2.      Leroy Loudermilk ("Lee") is a citizen of Indiana and resides in Valparaiso, Indiana.

**ANSWER:**    Greenberg Traurig lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in Paragraph 2, and therefore denies those allegations.


3.      LML Money Management Corp. ("LML") is an Illinois corporation that maintains its principal place of business in Homewood, Illinois.

**ANSWER:**    Greenberg Traurig admits that LML is an Illinois corporation.

Greenberg Traurig lacks knowledge or information sufficient to form a belief as to the truth

of the remaining allegation in Paragraph 3, and therefore denies that allegation.


4.      Nashville Partners Fund, LLC ("NPF") is a Delaware limited liability company that maintains its principal place of business in Homewood, Illinois.  Lee holds a 99% interest in NPF and LML owns the remaining 1% interest in NPF.

**ANSWER:**    Greenberg Traurig admits that NPF is a Delaware limited liability

company. Greenberg Traurig lacks knowledge or information sufficient to form a belief as to

the truth of the remaining allegations in Paragraph 3, and therefore denies those allegations.


5.      Greenberg Traurig, LLP ("GT") is a New York limited liability partnership with two partners, Greenberg Traurig of New York, P.C., a New York professional corporation, and Greenberg Traurig, P.A., a Florida professional association.  Greenberg Traurig of New York, P.C. has its principal place of business in New York, and Greenberg Traurig, P.A. has its principal place of business in Florida.  Although GT is authorized to transact business in Illinois, neither of its two partners are citizens of Illinois for diversity purposes.  At all times relevant to this Complaint, GT served as Lee's, LML's, and NPF's lawyers.

**ANSWER:**    Greenberg Traurig admits that it is a New York limited liability

partnership with two partners, Greenberg Traurig of New York, P.C., a New York

professional corporation, and Greenberg Traurig, P.A., a Florida professional association.

Greenberg Traurig admits that Greenberg Traurig of New York, P.C. has its principal place

of business in New York, and Greenberg Traurig, P.A. has its principal place of business in

Florida.  Greenberg Traurig admits that it served as Lee's lawyer from approximately July

19, 2001 through at least some time in 2003, but denies that it served as LML's and NPF's

lawyers.  The remaining allegations in Paragraph 5 are legal conclusions to which a response

from Greenberg Traurig is neither necessary nor appropriate.  To the extent that an answer is

required, Greenberg Traurig admits that this Court has personal jurisdiction over Greenberg

Traurig but denies any remaining allegations of fact in Paragraph 5.

### JURISDICTION AND VENUE

6.    This Court has subject matter jurisdiction over this action pursuant to 28
U.S.C. §I332(a)(1) because the matter in controversy exceeds the sum or value of $75,000,
exclusive of interest and costs, and is between citizens of different states.

**ANSWER:**    Greenberg Traurig admits that the Court has subject matter jurisdiction

over this action but denies that Plaintiffs are entitled to any damages.

7.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a
substantial part of the events or omissions giving rise to the claim occurred in the Northern
District of Illinois.

**ANSWER:**    Greenberg Traurig admits that venue is proper in the Northern District

of Illinois, but denies the remaining allegations of fact in Paragraph 7.

### FACTUAL ALLEGATIONS

**Background**

8.    Prior to January 2001, Lee was the owner of Midwest Fastener Corp., an
Illinois corporation ("MFC").  In January 2001, Lee sold his interest in MFC, which sale
resulted in a taxable gain to Lee of over $37 million (the "Sale Transaction").

**ANSWER:**    Greenberg Traurig lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 8, and therefore denies those allegations.

9.    Following this sale, American National Bank (predecessor to Bank One, which is the predecessor to JP Morgan Chase) (the "Bank") solicited Lee to enter into a series of transactions designed to generate losses to offset this gain (the "Tax Shelter Transactions" as defined below and the "Trust" as defined below). The Bank recommended that Lee use GT as his counsel in connection with the Tax Shelter Transactions.

**ANSWER:**    Greenberg Traurig lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 9, and therefore denies those allegations.

10.    On or about July 19, 2001, GT and Lee entered into a written engagement agreement under which GT would provide advice regarding the Tax Shelter Transactions (the "Tax Shelter Engagement Letter"). In the Tax Shelter Engagement Letter, GT claims a "...special expertise in securities transactions, including hedge funds and foreign currency contracts and derivatives...." The Tax Shelter Engagement Letter provides that GT will (a) assist in structuring the Tax Shelter Transactions; (b) render an opinion as to its Federal income tax consequences; and (c) provide defense in any administrative proceeding. A true and correct copy of the Tax Shelter Engagement Letter is attached hereto as Ex. 1.

**ANSWER:**    Greenberg Traurig admits that on or about July 19, 2001, Greenberg Traurig and Lee entered into a written engagement agreement. Greenberg Traurig admits that Paragraph 10 accurately references and quotes from a portion of the letter attached as Exhibit 1 to the Complaint, but Greenberg Traurig denies that the referenced and quoted portion of Exhibit 1 accurately reflects the full meaning and context thereof, and Greenberg Traurig refers to the entire content of Exhibit 1 for the full context and proper meaning and effect of the portion of that letter referenced and quoted by Paragraph 10. Greenberg Traurig denies any remaining allegations in Paragraph 10.

11.    GT acknowledged in the Tax Shelter Engagement Agreement that it had certain fiduciary obligations to Lee, including but not limited to the duty to avoid certain conflicts in its representation of Lee. GT also acknowledged the duty to inform Lee of any conflicts that may arise during the course of the representation. In violation of its express acknowledgement of these duties, GT failed to inform the Plaintiffs of its relationship with

the Bank and Bricolage Management Inc. ("Bricolage") and failed to inform the Plaintiffs that GT accepted payments from the Bank for referring clients to similar tax shelter strategies.

      **ANSWER:**    Greenberg Traurig denies the allegations in Paragraph 11.

12.     Subsequently, on or about October 1, 2001, Lee engaged GT to develop, create and implement a Charitable Remainder Uni-Trust (the "Trust"), recommended by the Bank as an additional tax savings device to manage his gain on the sale of MFC.

      **ANSWER:**    Greenberg Traurig admits that on or after October 1, 2001, Lee engaged Greenberg Traurig in connection with the formation of a Charitable Remainder Uni-Trust (the "Trust"). Greenberg Traurig lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 12, and therefore denies those remaining allegations.

13.     Lee had no prior relationship with GT and would not have used their legal services but for the recommendation of the Bank.

      **ANSWER:**    Greenberg Traurig admits that Lee had no prior relationship with Greenberg Traurig. Greenberg Traurig lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 13, and therefore denies those remaining allegations.

14.     Lee met with attorneys from GT on only one occasion and was accompanied by representatives of the Bank. Thereafter all communications regarding the organization of the tax shelter, the drafting of the Opinion Letter, the drafting of the Trust, and the collection of GT's fees relating to the Tax Shelter Transactions, were directed through personnel of the Bank.

      **ANSWER:**    Greenberg Traurig admits that attorneys from Greenberg Traurig met with Lee on one occasion and that Lee was accompanied by representatives of the Bank. Greenberg Traurig lacks knowledge or information sufficient to form a belief as to the truth

of the remaining allegations in Paragraph 14, and therefore denies those remaining

allegations.

15.     GT cooperated with the Bank and several other tax shelter promoters to
market and sell tax shelters to wealthy individuals, including the tax shelter sold to Lee.  Jay
I. Gordon ("Gordon"), a partner at GT, received on the firm's behalf payments from tax
shelter promoters, including the Bank, for referring clients to the tax shelter promoters.  The
acceptance of those payments, and the prospect of disciplinary action against Gordon, led to
Gordon's resignation from GT and from the New York bar. Gordon's resignation was
approved by the Departmental Disciplinary Committee of the Supreme Court of the State of
New York, Appellate Division, First Judicial Department.

**ANSWER:**     Greenberg Traurig admits that it received client referrals from the

Bank and that Jay I. Gordon ("Gordon"), a former partner at Greenberg Traurig, received

payments from others, but not the Bank.  Greenberg Traurig lacks knowledge or information

sufficient to form a belief as to the truth of the remaining allegations in Paragraph 15, and

therefore denies those remaining allegations.

**The Tax Shelter Transactions**

16.     The Tax Shelter Transactions involved the purchase of offsetting foreign
currency derivative positions by Nairobi II Partners Fund, LLC ("Nairobi II").  At the time of
formation, Nairobi II was owned 99% by Nairobi Partners Fund, LLC ("Nairobi") and 1% by
Delta Currency Management Company ("Delta").  At the time of formation, Nairobi was
owned 99% by NPF and 1% by Delta.  After a series of transactions undertaken following its
formation but prior to Lee's involvement, NPF was owned 99% by two limited liability
companies owned, in turn, by two individuals (the "NPF Initial Members") and 1% by
Bricolage.

**ANSWER:**     Greenberg Traurig admits the allegations in Paragraph 16 were

represented by Lee to Greenberg Traurig as true and assumed to be true by Greenberg

Traurig in the Opinion Letter, but Greenberg Traurig lacks knowledge or information

sufficient to form a belief as to the truth of the allegations in Paragraph 16, and therefore

denies those allegations.  Greenberg Traurig refers to the entire content of the Opinion Letter

for the full context and proper meaning and effect of the portion of that letter referenced in

Paragraph 16.

17.     While the membership interests in NPF, Nairobi and Nairobi II were owned in accordance with the initial structure, Nairobi II invested approximately $316,910 in various foreign currency derivative contracts.  The investments of Nairobi II in a portion of the currency derivative contracts generated taxable gains, net of losses and deductions of approximately $45,924,000 prior to August 31, 2001, and the cash generated by these gains was then invested in various certificates of deposit which totaled approximately $45,930,000 as of such date.  On August 31, 2001, Nairobi II also held loss positions of approximately $45,930,000 in the remaining currency derivative contracts in its portfolio.

**ANSWER:**     Greenberg Traurig admits the allegations in Paragraph 17 were

represented by Lee to Greenberg Traurig as true and assumed to be true by Greenberg

Traurig in the Opinion Letter, but Greenberg Traurig lacks knowledge or information

sufficient to form a belief as to the truth of the allegations in Paragraph 17, and therefore

denies those allegations.  Greenberg Traurig refers to the entire content of the Opinion Letter

for the full context and proper meaning and effect of the portion of that letter referenced in

Paragraph 17.

18.     As of August 31, 2001, Lee purchased 99% of the membership interests in NPF from the NPF Initial Members, and formed LML that purchased the remaining 1% membership interest from Bricolage.  The total purchase price for all of the membership interests was $1,826,760.87.  Lee contributed an additional $30,356,571.70 to NPF between August 31, 2001 and January 1, 2002.  The contribution of assets to NPF was necessary to the Tax Shelter Transactions as otherwise Lee would not have had insufficient basis against which to claim the losses.

**ANSWER:**     Greenberg Traurig lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in the final sentence of Paragraph 18, and therefore

denies those allegations.  Answering further, Greenberg Traurig admits the remaining

allegations in Paragraph 18 were represented by Lee to Greenberg Traurig as true and

assumed to be true in the Opinion Letter but Greenberg Traurig lacks knowledge or

information sufficient to form a belief as to the truth of the remaining allegations in

Paragraph 18, and therefore denies those remaining allegations.  Greenberg Traurig refers to

the entire content of the Opinion Letter for the full context and proper meaning and effect of

the portion of that letter referenced in Paragraph 18.

19.    On October 1, 2001, Nairobi sold its 99% membership interest in Nairobi II to unrelated parties for the amount of $297,388.32.  Delta retained its 1% interest.  As a result of Nairobi's sale of its 99% membership interest in Nairobi II for an aggregate price of $297,388.32, Nairobi claimed a loss of $31,584,469.  The loss was allocated 99% to NPF and 1% to Delta.  NPF's allocated portion of Nairobi's loss was then allocated 99% to Lee, individually, and 1% to LML.  LML's portion of the loss was allocated 100% to Lee.

**ANSWER:**    Greenberg Traurig admits the allegations in Paragraph 19 were

represented by Lee to Greenberg Traurig as true and assumed to be true by Greenberg

Traurig in the Opinion Letter, but Greenberg Traurig lacks knowledge or information

sufficient to form a belief as to the truth of the allegations in Paragraph 19, and therefore

denies those allegations.  Greenberg Traurig refers to the entire content of the Opinion Letter

for the full context and proper meaning and effect of the portion of that letter referenced in

Paragraph 19.

20.    GT represented to Lee that the proposed currency transactions, the purchase of his membership interests in NPF and the related sale of the Nairobi II interest at a loss by Nairobi (collectively, the "Tax Shelter Transactions"), would permit Lee to claim 99% of the "loss" realized by Nairobi on his 2001 income tax returns.  By claiming the loss realized by Nairobi, GT represented that Lee could effectively defer taxation of Lee's gain from the Sale Transaction.

**ANSWER:**    Greenberg Traurig denies the allegations in Paragraph 20.

**GT's Misrepresentations to Plaintiffs**

21.    GT knew or should have known that the above transactions constituted a tax shelter within the meaning of Code Section 6111(c)(1), and, therefore, that it was illegally promoting an unregistered tax shelter.  Despite this, on March 7, 2002, GT issued an opinion

letter to Lee (the "Opinion Letter") giving its approval to the Tax Shelter Transaction and representing that more likely than not it would be respected for federal income tax purposes.

**ANSWER:**    Greenberg Traurig denies that it knew or should have known that the

above transactions constituted a tax shelter within the meaning of Code Section 6111(c)(1),

and/or that it was illegally promoting an unregistered tax shelter.  Greenberg Traurig admits

that on March 7, 2002, Greenberg Traurig issued an Opinion Letter to Lee and that Paragraph

21 references a portion of that Opinion Letter.  Greenberg Traurig refers to the entire content

of the Opinion Letter for the full context and proper meaning and effect of the portion of that

letter referenced in Paragraph 21.  Greenberg Traurig denies any remaining allegations

contained in Paragraph 21.


22.    On information and belief, GT and Gordon had previously prepared form opinion letters approving transactions similar to the Tax Shelter Transactions for other clients and needed only to fill in certain blanks for each of the many clients to which they rendered such opinion letters.

**ANSWER:**    Greenberg Traurig admits that Jay Gordon previously prepared

opinion letters for other clients involving the likely consequences of certain tax transactions.

Greenberg Traurig denies that those were form letters and that it only needed to fill in certain

blanks for the clients to which it rendered such opinion letters.  Greenberg Traurig denies the

remaining allegations contained in Paragraph 22.


23.    In the Opinion Letter, GT represented to Plaintiffs that Lee's and LML's investment in NPF and NPF's investments in the currency derivative contracts will have "real economic consequences and have a potential for substantial profits."  GT further represented that the Tax Shelter Transaction "...had a reasonable possibility of producing substantial profits in excess of all costs and fees incurred in connection therewith...."  This representation was made after all of the option contracts were closed and it was known that the economic consequences of the offsetting contracts were negligible or nonexistent.

**ANSWER:**    Greenberg Traurig admits that it concluded that there would be real

economic consequences and there was a reasonable possibility that the contemplated

transactions would produce substantial profits, but states that the factual representations upon which those conclusions were based were represented to Greenberg Traurig by Lee as true and assumed to be true in the Opinion Letter. Greenberg Traurig further admits that Paragraph 23 accurately quotes portions of the Opinion Letter, but Greenberg Traurig denies that the quoted portions of the Opinion Letter accurately reflect the full meaning and context thereof, and Greenberg Traurig refers to the entire content of the Opinion Letter for the full context and proper meaning and effect of the portions of that letter quoted in Paragraph 23. Greenberg Traurig denies the remaining allegations in Paragraph 23.

24.    GT also represented to Plaintiffs that "no predetermined tax result will transpire from trading in the [currency derivative contracts]." GT was well aware of the marketing of the Tax Shelter Transactions in which the tax benefits were promoted and no mention was made of any potential for economic gain or loss. Moreover, GT was aware that the fees of the Bank and Bricolage were based solely on the amount of the projected tax loss.

**ANSWER:**    Greenberg Traurig admits that it concluded that there would be no predetermined tax result from the contemplated transactions, but states that the factual representations upon which that conclusion was based were represented to Greenberg Traurig by Lee as true and assumed to be true in the Opinion Letter. Greenberg Traurig further admits that Paragraph 24 accurately quotes a portion of the Opinion Letter, but Greenberg Traurig denies that the quoted portion of the Opinion Letter accurately reflects the full meaning and context thereof, and Greenberg Traurig refers to the entire content of the Opinion Letter for the full context and proper meaning and effect of the portion of that letter quoted in Paragraph 24. Greenberg Traurig denies the remaining allegations in Paragraph 24.

25.    GT opined that "it [was] more likely than not" that the losses generated by the Tax Shelter Transactions could be properly claimed by Lee as a capital loss on his 2001 tax return to offset the gain realized from the sale of MFC.

**ANSWER:**     Greenberg Traurig admits that it concluded it was more likely than not that Lee could claim the losses generated by the contemplated transactions on his 2001 tax return, but states that the factual representations upon which that conclusion was based were represented to Greenberg Traurig by Lee as true and assumed to be true in the Opinion Letter.  Greenberg Traurig further admits that Paragraph 25 accurately quotes a portion of the Opinion Letter, but Greenberg Traurig denies that the quoted portion of the Opinion Letter accurately reflects the full meaning and context thereof, and Greenberg Traurig refers to the entire content of the Opinion Letter for the full context and proper meaning and effect of the portion of that letter quoted in Paragraph 25.  Greenberg Traurig denies any remaining allegations in Paragraph 25.

26.     On December 27, 1999, the Internal Revenue Service, (the "IRS") published IRS Notice 1999-59, entitled "Tax Avoidance Using Distribution of Encumbered Property." In that notice, the IRS stated that:

> [t]he Internal Revenue Service and Treasury Department have become aware of certain types of transactions, as described below, that are being marketed to taxpayers for the purpose of generating tax losses. This notice is being issued to alert taxpayers and their representatives that the purported losses arising from such transactions are not properly allowable for federal income tax purpose ...  Through a contrived series of steps, taxpayers claim losses for capital outlays that they have in fact recovered. Such artificial loses are not allowable for federal income tax purposes.

**ANSWER:**     Greenberg Traurig admits that Paragraph 26 accurately quotes a portion of IRS Notice 1999-59.  Greenberg Traurig refers to the entire content of IRS Notice 1999-59 for the full context and proper meaning and effect of the portion of IRS Notice 1999-59 quoted in Paragraph 26.

27.     IRS Notice 1999-59 referenced transactions substantially similar to the Tax Shelter Transactions involved here.  As a result of Notice 1999-59, which was published well in advance of the Opinion Letter written by GT, GT knew or should have know at the time it

issued its Opinion Letter to Plaintiffs that the purported losses arising from the Tax Shelter Transactions were not properly allowable for federal or state income tax purposes.

**ANSWER:**    The phrase "substantially similar to the Tax Shelter Transactions" is too vague to permit an answer, and Greenberg Traurig therefore denies the allegation in the first sentence of paragraph 27.  Greenberg Traurig denies the remaining allegations in Paragraph 27.

28.    Further, GT never corrected its prior Opinion Letter by advising Plaintiffs of Notice 1999-59 and its effect on the Tax Shelter Transactions as was its duty.

**ANSWER:**    The allegations in Paragraph 28 are legal conclusions to which a response from Greenberg Traurig is neither necessary nor appropriate.  To the extent an answer is required, Greenberg Traurig denies the allegations in Paragraph 28.

29.    Additionally, on September 5, 2000, the IRS published Notice 2000-44, entitled "Tax Avoidance Using Artificially High Basis."  That Notice concerned "similar transactions [to those described in Notice 1999-59] that purported to generate tax losses for taxpayers."  Notice 2000-44, which referenced transactions substantially similar to the Tax Shelter Transactions involved here and the IRS again stated that:

> [t]he purported loses from these transactions (and from any similar arrangements designed to produce noneconomic tax losses by artificially overstating basis in partnership interests) are not allowable as deduction fro federal income tax purposes.

**ANSWER:**    Greenberg Traurig admits that Paragraph 29 accurately quotes portions of IRS Notice 2000-44.  Greenberg Traurig refers to the entire content of IRS Notice 2000-44, for the full context and proper meaning and effect of portions of IRS Notice 2000-44 quoted in Paragraph 29.  Greenberg Traurig denies the remaining allegations in Paragraph 29.

30.    As a result of Notice 2000-44, which was published well in advance of the Opinion Letter written by GT, GT knew or should have know at the time it issued its Opinion

Letter to Plaintiffs that the purported losses arising from the Tax Shelter Transactions were not properly allowable for federal or state income tax purposes, yet GT offers only a cursory discussion of the Notice and minimized its significance. Notice 2000-44 is even clearer than Notice 1999-59 in stating that, with regard to any similar transactions to those described in the Notices, the non-economic losses produced by such transactions would not be allowable as a deduction. Therefore, there could have been no doubt on the part of GT that the losses generated by the Tax Shelter Transactions here would not be allowable deductions, despite what it falsely represented in its Opinion Letter.

      **ANSWER:**    Greenberg Traurig denies the allegations in Paragraph 30.


      31.    Further, GT never corrected its prior Opinion Letter by advising Plaintiffs of the true effect of Notice 2000-44 and its relevance to the Tax Shelter Transactions as was its duty.

      **ANSWER:**    Greenberg Traurig admits that it did not revise its Opinion Letter, but

denies that it was obligated to do so, and therefore denies the remaining allegations in

Paragraph 31.


      32.    On July 2, 2002, the IRS published Notice 2002-50 in which it announced that all losses from transactions similar to the Tax Shelter Transactions would be disallowed as a deduction, as would all fees paid with respect to such transactions. The transactions described in Notice 2002-50 are identical in all relevant aspects to the Tax Shelter Transactions.

      **ANSWER:**    Greenberg Traurig admits that the IRS published IRS Notice 2002-50

on or about July 2, 2002. Greenberg Traurig denies the remaining allegations in Paragraph

32.


      33.    GT failed to inform Plaintiffs of the issuance of Notice 2002-50 and the effect of its issuance on the opinions set forth in its Opinion Letter. GT failed to advise Plaintiffs to prepare and file their tax returns (or amended tax returns) in a manner consistent with 2002-50. GT never retracted its advice or representations to Plaintiffs regarding the propriety of the Tax Shelter Transactions.

      **ANSWER:**    Greenberg Traurig admits that it did not inform Plaintiffs of the

issuance of Notice 2002-50 and the effect of its issuance on the opinions set forth in its

Opinion Letter, but denies that Greenberg Traurig had any obligation to do so. The

remaining allegations in Paragraph 33 are legal conclusions to which a response from

Greenberg Traurig is neither necessary nor appropriate.  To the extent an answer is required,

Greenberg Traurig denies the allegations in Paragraph 33.

> 34.    GT had a duty to inform Plaintiffs of the change in the law since it agreed to continuing representation of Lee following the issuance of the Opinion Letter.  For that continuing representation, GT accepted and never returned $20,000 it received in payment specifically for its continuing representation.  The $20,000 fee was paid to GT by the Bank.

**ANSWER:**    The allegations in the first sentence of Paragraph 34 are legal

conclusions to which a response from Greenberg Traurig is neither necessary nor

appropriate.  To the extent an answer is required, Greenberg Traurig denies the allegations in

the first sentence of Paragraph 34.  Greenberg Traurig admits that it received payments,

including from the Bank, in connection with its representation of Lee, but denies that it was

obligated to give those payments to anyone else.  Greenberg Traurig denies any remaining

allegations of fact in Paragraph 34.

> 35.    GT lured Plaintiffs into the Tax Shelter Transactions when it knew or should have known it to be an unlawful and unregistered tax shelter which would not be recognized by the IRS for tax purposes.

**ANSWER:**    Greenberg Traurig denies the allegations in Paragraph 35.

> 36.    Plaintiffs relied on its long standing relationship of trust with the Bank, the Bank's recommendation of GT, and GT's misrepresentations in its Opinion Letter in entering into the Tax Shelter Transactions.  Because of GT's misrepresentations, Plaintiffs have suffered considerable economic loss.

**ANSWER:**    Greenberg Traurig lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in Paragraph 36 that Plaintiffs relied on their

longstanding relationship of trust with the Bank and the Bank's recommendation of

Greenberg Traurig, and therefore denies those allegations. Greenberg Traurig denies the

remaining allegations in Paragraph 36.

### Defendant's Negligence in Drafting the Trust Agreement

37.     On or about November 1, 2001, GT prepared for NPF a certain Trust
Agreement. Lee signed the Agreement on behalf of NPF as grantor. The Trust Agreement,
which is a charitable remainder unitrust ("Trust"), provides that NPF is to receive each year
(on December 31) a unitrust payment equal to the lesser of the net income of the Trust for the
taxable year and 11.5% of the net fair market value of the assets of the Trust as of the first
business day of the year. If, in any taxable year, the trust income exceeds 11.5%, Lee will
also be paid the excess income to the extent that the aggregate amounts previously received
by Lee were less than the aggregate amounts computed using the 11.5% payout rate. Any
assets remaining in the Trust as of the end of the Trust's term must be distributed to a
charitable beneficiary. This type of charitable remainder unitrust is called a net income
make-up charitable remainder uni-trust, or "NIMCRUT." Importantly, under the terms of the
Trust capital gains are not treated as income of the Trust. The Trust has a 20 year term. The
Trust document as prepared by GT designates Opportunity Enterprises, Inc., of Valparaiso,
Indiana, as the charitable beneficiary. NPF, as grantor, retains the right to replace the
charitable beneficiary prior to the end of the term of the Trust. In no event can distributions
be made which would reduce the remainder charity's interest to less than 10% of the original
value of the Trust ($1,928,023).

**ANSWER:**    Greenberg Traurig admits the factual allegations contained in

Paragraph 37. Answering further, Greenberg Traurig admits that Paragraph 37 accurately

references portions of the Trust, and refers to the entire content of the Trust for the full

context and proper meaning and effect of the portions of the Trust referenced by Paragraph

37.


38.     On or about November 1, 2001, NPF contributed assets to the Trust having a
value of $19,280,228. NPF reported charitable contributions of $1,928,023 on its tax return
for 2001, and Lee took a charitable deduction on his income tax return for 2001 equal to his
allocable share of NPF's charitable contributions.

**ANSWER:**    Greenberg Traurig admits that on or about November 1, 2001, Lee, or

an entity with which Lee was affiliated or which he controlled (such as NPF), contributed

assets to the Trust having a value of approximately $19,280,228. Greenberg Traurig lacks

knowledge or information sufficient to form a belief as to the truth of the remaining

allegations in Paragraph 38, and therefore denies those remaining allegations.

39.    Lee understood, from what he had been told by GT, that he would be deferring the income distributions in the early years of the Trust but that he would get back at least approximately 90% of the value of the assets contributed to the Trust during the term of the Trust and that the charity would get approximately 10% of the value of the assets contributed to the Trust at the end of the term, which was satisfactory to Lee and to NPF.

**ANSWER:**    Greenberg Traurig denies that it told Lee that he would be deferring

the income distributions in the early years of the Trust but that he would get back at least

approximately 90% of the value of the assets contributed to the Trust during the term of the

Trust and that the charity would get approximately 10% of the value of the assets contributed

to the Trust at the end of the term.  Greenberg Traurig states that it lacks knowledge or

information sufficient to form a belief as to the truth of the remaining allegations in

Paragraph 39, and therefore denies those allegations.

40.    If NPF and Lee had been advised that they would not get back at least approximately 90% of the value of the assets contributed to the Trust, they would not have agreed to a NIMCRUT.

**ANSWER:**    Greenberg Traurig lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in Paragraph 40, and therefore denies those

allegations.

41.    Additionally, GT represented to Plaintiffs that the Trust would be drafted to pay NPF, on an annual basis, the greater of the Trust's income or 11.5% of the value of the trust as of the end of the preceding year.  Instead, the Trust was erroneously drafted in such a manner as to generate for NPF the lesser of the trust's income or 11.5% of the value of the trust as of the end of the preceding year.

**ANSWER:**    Greenberg Traurig denies the allegations in Paragraph 41.

42.    Under the terms of the Trust, as drafted, there is almost no possible way that Lee would get back 90% of the value of the assets contributed to the Trust over its term.  Lee contributed to the Trust a 99% limited partnership interest in LML having a value of $19,280,228.  The Trust's basis in the limited partnership immediately after the contribution was $19,280,228.  Unless the assets held by the limited partnership (and therefore, the Trust's interest in the limited partnership) appreciate substantially, there would be no capital gains upon their sale.  (There is currently a loss in the value of the assets.)  In any event, even if the assets do appreciate, by the terms of the Trust, capital gains are not part of income and can, therefore, never be part of the payout to Lee, so that the makeup provision is meaningless unless the ordinary income of the Trust exceeds 11.5% in a particular year.

**ANSWER:**    Greenberg Traurig admits that under the terms of the Trust, there is almost no possible way that Lee would get back 90% of the value of the assets contributed to the Trust over its term and that capital gains are not part of income.  Greenberg Traurig admits that Lee, or an entity with which Lee was affiliated or which he controlled (such as NPF), contributed to the Trust a 99% limited partnership interest in LML having a value of approximately $19,280,228.  Greenberg Traurig admits that the Trust contends its basis in the limited partnership immediately after the contribution was $19,280,228.  Greenberg Traurig admits that unless the assets held by the limited partnership appreciate substantially, there would be no capital gains upon their sale.  Greenberg Traurig admits that even if the assets do appreciate, by the terms of the Trust, capital gains are not part of income and can never be part of the payout to Lee.  Greenberg Traurig lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 42, and therefore denies those allegations.

43.    In deciding whether to contribute $19,280,228 to the Trust, Lee and NPF relied upon the advice and representations given by GT.

**ANSWER:**    Greenberg Traurig lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 43, and therefore denies those allegations.

44.     Lee has fully paid all legal bills due under his agreement with GT. None of the Plaintiffs has any financial or other obligation to GT.

**ANSWER:**     Greenberg Traurig admits the allegations in Paragraph 44.

### Count I - Breach of Fiduciary Duty - Tax Shelter Transaction

45.     Plaintiffs repeat and reallege each and every prior allegation in Paragraphs 1 through 44, inclusive, as if fully set forth herein.

**ANSWER:**     Greenberg Traurig adopts and realleges its answers to Paragraphs 1-44 as though fully set forth herein.

46.     GT, as Plaintiff s attorneys, was Plaintiffs' fiduciary and thus owed Plaintiffs the duty of honesty, loyalty, care and compliance with the applicable codes of professional responsibility.  GT acknowledges its duties to Plaintiffs by its references to the Rules of "Professional Responsibility Governing the New York Bar" in the Tax Shelter Engagement Letter.  Moreover, GT specifically acknowledges its duties with respect to conflicts of interest in the same letter.

**ANSWER:**     Greenberg Traurig admits that the letter attached as Exhibit 1 to the Complaint references the Rules of "Professional Responsibility Governing the New York Bar."  Greenberg Traurig admits that Paragraph 46 accurately quotes from a portion of the letter attached as Exhibit 1 to the Complaint, but Greenberg Traurig denies that the quoted portion of Exhibit 1 accurately reflects the full meaning and context thereof, and Greenberg Traurig refers to the entire content of Exhibit 1 for the full context and proper meaning and effect of the portion of that letter quoted by Paragraph 46.  The remaining allegations in Paragraph 46 are legal conclusions to which a response from Greenberg Traurig is neither necessary nor appropriate.  To the extent an answer is required, Greenberg Traurig denies the remaining factual allegations in Paragraph 46.

47.     GT breached these duties by fraudulently inducing Plaintiffs to enter into the Tax Shelter Transactions in reliance on GT's Opinion Letter which GT knew or should have known to be false and which was for the sole purpose of generating huge fees for GT.

**ANSWER:**    Greenberg Traurig denies the allegations in Paragraph 47.

48.    As a result of GT's conduct as set forth herein, Plaintiffs have suffered injury, including, but not limited to: Lee paid the sum of $100,000 to GT for its advice related to the Tax Shelter Transactions and the Opinion Letter; Lee and NPF paid $1,455,935 in fees and costs associated with the Tax Shelter Transactions to the Bank, Delta, Bricolage, and other parties associated with Bricolage; Lee paid the sum of $632,307 in penalties to the IRS related to the Tax Shelter Transactions; Lee paid the sum of approximately $2,723,585 in interest to the IRS related to the Tax Shelter Transactions; Lee paid approximately $286,000 to the IRS to settle another matter, the settlement of which the IRS made a condition of its settling the Lee's liability, related to the reporting of the Tax Shelter Transactions; and Lee, NPF and LML have incurred in excess of $325,000 in additional legal and accounting fees related to the IRS' examination and settlement of the Tax Shelter Transactions.

**ANSWER:**    Greenberg Traurig admits that it received $100,000 on behalf of Lee.

Greenberg Traurig denies that Plaintiffs have suffered any injury or that Greenberg Traurig's

conduct has caused Plaintiffs any injury.  Greenberg Traurig lacks knowledge or information

sufficient to form a belief as to the truth of the remaining allegations in Paragraph 48, and

therefore denies those remaining allegations.

49.    As a direct and proximate cause of the foregoing, Plaintiffs have been injured in an amount in excess of $5.5 Million, and should be awarded punitive damages of $5 Million.

**ANSWER:**    Greenberg Traurig denies the allegations in Paragraph 48.

## Count II - Breach of Fiduciary Duty - Trust

50.    Plaintiffs repeat and reallege each and every prior allegation in Paragraphs 1 through 44, inclusive, as if fully set forth herein.

**ANSWER:**    Greenberg Traurig adopts and realleges its answers to Paragraphs 1-44

as though fully set forth herein.

51.    GT, as Plaintiff's attorneys, was Plaintiffs' fiduciary and thus owed Plaintiffs the duty of honesty, loyalty, care and compliance with the applicable codes of professional responsibility.  GT acknowledges its duties to Plaintiffs by its references to the Rules of "Professional Responsibility Governing the New York Bar" in the Tax Shelter Engagement

Letter. Moreover, GT specifically acknowledges its duties with respect to conflicts of interest in the same letter.

**ANSWER:** Greenberg Traurig admits that the letter attached as Exhibit 1 to the Complaint references the Rules of "Professional Responsibility Governing the New York Bar." Greenberg Traurig admits that Paragraph 51 accurately quotes from a portion of the letter attached as Exhibit 1 to the Complaint, but Greenberg Traurig denies that the quoted portion of Exhibit 1 accurately reflects the full meaning and context thereof, and Greenberg Traurig refers to the entire content of Exhibit 1 for the full context and proper meaning and effect of the portion of that letter quoted by Paragraph 51. The remaining allegations in Paragraph 51 are legal conclusions to which a response from Greenberg Traurig is neither necessary nor appropriate. To the extent an answer is required, Greenberg Traurig denies the remaining factual allegations in Paragraph 51.

52.    GT breached these duties by erroneously drafting the Trust with substantially different provisions and effect than how GT told Plaintiffs they would draft the Trust, for the sole purpose of generating huge fees for GT.

**ANSWER:** Greenberg Traurig denies the allegations in Paragraph 52.

53.    As a result of GT's conduct as set forth herein, Plaintiffs have suffered injury, including, but not limited to: Lee paid GT the sum of $20,000 for its advice and its preparation of the documents for the Trust; NPF contributed assets to the Trust of which at least $1,928,023 cannot be recovered from the Trust; and Lee, NPF and LML have and will incur legal and accounting fees related to the Trust in excess of $600,000 over the term of the Trust.

**ANSWER:** Greenberg Traurig admits that it received $20,000 on behalf of Lee and that Lee, or an entity with which Lee was affiliated or which he controlled (such as NPF), contributed assets to the Trust. Greenberg Traurig denies that Plaintiffs have suffered any injury or that Greenberg Traurig's conduct has caused Plaintiffs any injury. Greenberg

Traurig lacks knowledge or information sufficient to form a belief as to the truth of the

remaining allegations in Paragraph 53, and therefore denies those remaining allegations.

54.    As a direct and proximate cause of the foregoing, Plaintiffs have been injured
in an amount in excess of $2.5 Million.

**ANSWER:**    Greenberg Traurig denies the allegations in Paragraph 54.

## Count III - Fraud - Tax Shelter Transaction

55.    Plaintiffs repeat and reallege each and every prior allegation in Paragraphs 1
through 44, inclusive, as if fully set forth herein.

**ANSWER:**    Greenberg Traurig adopts and realleges its answers to Paragraphs 1-44

as though fully set forth herein.

56.    In order to induce Plaintiffs to pay them thousands of dollars of fees, GT
made numerous knowingly false affirmative representations and intentional omissions of
material fact to Plaintiffs, including: (1) the representation that the Tax Shelter Transactions
would be recognized by the IRS for tax purposes; (2) failing to disclose existing published
authority, including the Notices published by the IRS, which advised that losses such as those
generated by the Tax Shelter Transactions would not be allowed; and (3) failing to advise
Plaintiffs at a later time that the representations in their Opinion Letter were false.

**ANSWER:**    Greenberg Traurig denies the allegations in Paragraph 56.

57.    By its affirmative misrepresentations and intentional omission of material
facts, Plaintiffs, in reasonable reliance on GT's said false representations and misleading
omissions, paid legal fees to GT for tax and legal advice, and entered into the Tax Shelter
Transactions while failing to avail themselves of alternate legitimate tax savings
opportunities.

**ANSWER:**    Greenberg Traurig admits that it received legal fees on Lee's behalf.

Greenberg Traurig denies the remaining allegations in Paragraph 57.

58.    Upon discovering GT's fraud, Plaintiffs incurred and will continue to incur
substantial additional costs in hiring new tax and legal advisors to rectify the situation.

**ANSWER:**    Greenberg Traurig denies the allegations in Paragraph 58.

59. As a result of GT's conduct as set forth herein, Plaintiffs have suffered injury, including, but not limited to: Lee paid the sum of $100,000 to GT for its advice related to the Tax Shelter Transactions and the Opinion Letter; Lee and NPF paid $1,455,935 in fees and costs associated with the Tax Shelter Transactions to the Bank, Delta, Bricolage, and other parties associated with Bricolage; Lee paid the sum of $632,307 in penalties to the IRS related to the Tax Shelter Transactions; Lee paid the sum of approximately $2,723,585 in interest to the IRS related to the Tax Shelter Transactions; Lee paid approximately $286,000 to the IRS to settle another matter, the settlement of which the IRS made a condition of its settling the Lee's liability related to the reporting of the Tax Shelter Transactions; and Lee, NPF and LML have incurred in excess of $325,000 in additional legal and accounting fees related to the IRS' examination and settlement of the Tax Shelter Transactions.

**ANSWER:**    Greenberg Traurig admits that it received $100,000 on behalf of Lee.

Greenberg Traurig denies that Plaintiffs have suffered any injury or that Greenberg Traurig's

conduct has caused Plaintiffs any injury.  Greenberg Traurig lacks knowledge or information

sufficient to form a belief as to the truth of the remaining allegations in Paragraph 59, and

therefore denies those remaining allegations.

60. As a proximate cause of the foregoing, Plaintiffs have been injured in an amount in excess of $5.5 Million, and should be awarded punitive damages of $5 Million.

**ANSWER**:    Greenberg Traurig denies the allegations in Paragraph 60.

### Count IV - Negligence/Negligent Misrepresentation/Professional Malpractice - Tax Shelter Transaction

61. Plaintiffs repeat, re-allege, and incorporate the allegations contained in Paragraphs 1 through 44 as if fully set forth herein.

**ANSWER:**    Greenberg Traurig adopts and realleges its answers to Paragraphs 1-44

as though fully set forth herein.

62. In its capacity as attorneys for Plaintiffs, GT was obligated to use such skill, prudence and diligence as well qualified members of the legal profession and were required to act with good faith and fidelity.

**ANSWER:**    The allegations in Paragraph 62 are legal conclusions to which a

response from Greenberg Traurig is neither necessary nor appropriate.  To the extent that an

answer is required, Greenberg Traurig states that the law imposes certain duties on

Greenberg Traurig as attorneys, as defined by the applicable governing law.  Greenberg

Traurig denies any remaining allegations of fact in Paragraph 62.


63.     During the course of its representation of Plaintiffs, GT made numerous negligently false affirmative representations and intentional or negligently misleading omissions of material facts to Plaintiffs including: (1) the representation that the Tax Shelter Transactions would be recognized by the IRS for tax purposes; (2) failing to disclose existing published authority, including the Notices published by the IRS, which advised that losses such as those generated by the Tax Shelter Transactions would not be allowed; (3) knowingly or negligently misrepresenting the effect of published guidance on the tax treatment of the Tax Shelter Transactions; and (4) failing to advise Plaintiffs at a later time that the representations in its Opinion Letter were false. In providing this advice to Plaintiffs, GT failed to exercise the standard of care required by it as attorneys.

**ANSWER:**     Greenberg Traurig denies the allegations in Paragraph 63.


64.     Because GT knew that it was the intent and primary purpose of Plaintiffs to use the advice given to Plaintiffs by GT in deciding whether or not to enter into the Tax Shelter Transactions and reporting the Tax Shelter Transactions for federal and state income tax purposes, GT owed a duty to NPF to communicate accurate and correct information to Plaintiffs about the Tax Shelter Transactions.

**ANSWER:**     The allegations in Paragraph 64 are legal conclusions to which a

response from Greenberg Traurig is neither necessary nor appropriate.  To the extent an

answer is required, Greenberg Traurig denies the allegations of fact in Paragraph 64.


65.     GT knew or reasonably should have known their advice to be false.

**ANSWER:**     Greenberg Traurig denies the allegations in Paragraph 65.

66.     In reasonable reliance on GT's said false representations and misleading omissions regarding the Tax Shelter Transactions, NPF paid legal fees to GT for tax and legal advice, and entered into the Tax Shelter Transactions while failing to avail themselves of alternate legitimate tax savings opportunities.

**ANSWER:**     Greenberg Traurig admits that it received legal fees on Lee's behalf.

Greenberg Traurig denies the remaining allegations in Paragraph 66.

67.    NPF has suffered, and will continue to suffer severe economic loss as a direct and proximate result of GT's negligence and negligent misrepresentations.

**ANSWER:**    Greenberg Traurig denies the allegations in Paragraph 67.


68.    Upon discovering GT's fraud, Plaintiffs incurred and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation.

**ANSWER:**    Greenberg Traurig denies the allegations in Paragraph 68.


69.    As a result of GT's conduct as set forth herein, Plaintiffs have suffered injury, including, but not limited to: Lee paid the sum of $100,000 to GT for its advice related to the Tax Shelter Transactions and the Opinion Letter; Lee and NPF paid $1,455,935 in fees and costs associated with the Tax Shelter Transactions to the Bank, Delta, Bricolage, and other parties associated with Bricolage; Lee paid the sum of $632,307 in penalties to the IRS related to the Tax Shelter Transactions; Lee paid the sum of approximately $2,723,585 in interest to the IRS related to the Tax Shelter Transactions; Lee paid approximately $286,000 to the IRS to settle another matter, the settlement of which the IRS made a condition of its settling the Lee's liability related to the reporting of the Tax Shelter Transactions; and Lee, NPF and LML have incurred in excess of $325,000 in additional legal and accounting fees related to the IRS' examination and settlement of the Tax Shelter Transactions.

**ANSWER:**    Greenberg Traurig admits that it received $100,000 on behalf of Lee.

Greenberg Traurig denies that Plaintiffs have suffered any injury or that Greenberg Traurig's

conduct has caused Plaintiffs any injury.  Greenberg Traurig lacks knowledge or information

sufficient to form a belief as to the truth of the remaining allegations in Paragraph 69, and

therefore denies those remaining allegations.


70.    As a proximate cause of the foregoing, Plaintiffs have been injured in an amount in excess of $5.5 Million, and should be awarded punitive damages of $5 Million.

**ANSWER:**    Greenberg Traurig denies the allegations in Paragraph 69.


### Count V - Negligence/Negligent Misrepresentation/Professional Malpractice - Trust

71.    Plaintiffs repeat, re-allege, and incorporate the allegations contained in Paragraphs 1 through 44 as if fully set forth herein.

**ANSWER:**     Greenberg Traurig adopts and realleges its answers to Paragraphs 1-44 as though fully set forth herein.

72.     In its capacity as attorneys for Plaintiffs, GT was obligated to use such skill, prudence and diligence as well qualified members of the legal profession and were required to act with the most scrupulous good faith and fidelity.

**ANSWER:**     The allegations in Paragraph 72 are legal conclusions to which a response from Greenberg Traurig is neither necessary nor appropriate.  To the extent that an answer is required, Greenberg Traurig admits that the law imposes certain duties on Greenberg Traurig as attorneys, as defined by the applicable governing law, and refers to that law for the nature and extent of those duties.  Greenberg Traurig denies any remaining allegations of fact in Paragraph 72.

73.     During the course of its representation of Plaintiffs, GT made numerous negligently false affirmative representations and intentional or negligently misleading omission of material facts to Plaintiffs, and committed professional negligence and malpractice, including: (1) drafting the Trust in such a manner as to generate for NPF the lesser of the trust's income or 11.5% of the value of the trust as of the end of the preceding year; and (2) drafting the Trust in such a manner that it would never return at least approximately 90% of the value of the assets contributed to Plaintiffs, as GT had represented to Plaintiffs it would.

**ANSWER:**     Greenberg Traurig denies the allegations in Paragraph 73.

74.     Because GT knew that it was the intent and primary purpose of NPF to use the advice given to Lee by GT in order to make a $19,280,228 contribution to a trust vehicle, it owed a duty to communicate accurate and correct information to NPF about the trust vehicle it was recommending to be drafted and to draft the agreement in such a manner as to satisfy Lee's, LML's, and NPF's wishes and desires in connection with such a trust.

**ANSWER:**     Greenberg Traurig denies that it knew that it was the intent and primary purpose of NPF to use the advice given to Lee by Greenberg Traurig to make a $19,280,228 contribution to a trust vehicle.  The remaining allegations in Paragraph 74 are legal conclusions to which a response from Greenberg Traurig is neither necessary nor

appropriate.  To the extent that an answer is required, Greenberg Traurig denies the

remaining allegations of fact in Paragraph 74.

75.     GT knew or reasonably should have known their advice to be false.

**ANSWER:**     Greenberg Traurig denies the allegations in Paragraph 75.

76.     In reasonable reliance on GT's said false representations and misleading
omissions regarding the Trust, Lee, LML, and NPF justifiably and reasonably relied on GT's
advice and drafting of the Trust in depositing $19,280,228 into the Trust, entered into the
Trust while failing to avail themselves of alternate legitimate tax savings opportunities and
paid legal fees to GT for tax and legal advice.

**ANSWER:**     Greenberg Traurig denies that it made false representations and

misleading omissions regarding the Trust.  Greenberg Traurig admits that it received legal

fees on Lee's behalf.  The remaining allegations in Paragraph 76 are legal conclusions to

which a response from Greenberg Traurig is neither necessary nor appropriate.  To the extent

an answer is required, Greenberg Traurig denies the remaining allegations of fact in

Paragraph 76.

77.     Lee, LML, and NPF have suffered, and will continue to suffer, severe
economic loss as a direct and proximate result of GT's negligence and negligent
misrepresentations.

**ANSWER:**     Greenberg Traurig denies the allegations in Paragraph 77.

78.     Upon discovering GT's fraud, Plaintiffs incurred and will continue to incur
substantial additional costs in hiring new tax and legal advisors to rectify the situation.

**ANSWER:**     Greenberg Traurig denies the allegations in Paragraph 78.

79.     As a result of GT's conduct as set forth herein, Plaintiffs have suffered injury,
including, but not limited to: Lee paid GT the sum of $20,000 for its advice and its
preparation of the documents for the Trust; NPF contributed assets to the Trust of which at
least $1,928,023 cannot be recovered from the Trust; and Lee, NPF and LML have and will
incur legal and accounting fees related to the Trust in excess of $600,000 over the term of the
Trust.

**ANSWER:**    Greenberg Traurig admits that it received $20,000 on behalf of Lee

and that Lee, or an entity with which Lee was affiliated or which he controlled (such as

NPF), contributed assets to the Trust.  Greenberg Traurig denies that Plaintiffs have suffered

any injury or that Greenberg Traurig's conduct has caused Plaintiffs any injury.  Greenberg

Traurig lacks knowledge or information sufficient to form a belief as to the truth of the

remaining allegations in Paragraph 79, and therefore denies those remaining allegations.

80.    As a proximate cause of the foregoing, Plaintiffs have been injured in an
amountin excess of $2.5 Million.

**ANSWER:**    Greenberg Traurig denies the allegations in Paragraph 80.

**Count VI - Breach of Contract/Professional Malpractice - Tax Shelter Transaction**

81.    Plaintiffs repeat, re-allege, and incorporate the allegations contained in
Paragraphs 1 through 44 as if fully set forth herein.

**ANSWER:**    Greenberg Traurig adopts and realleges its answers to Paragraphs 1-44

as though fully set forth herein.

82.    Plaintiffs entered into oral and written contracts with GT to provide Plaintiffs
with professionally competent tax advice, legal services, to exercise the applicable standard
of care, loyalty and honesty, and to comply with all applicable rules of professional conduct.
The Tax Shelter Engagement Letter provides that GT will (a) assist in structuring the Tax
Shelter Transaction; (b) render an opinion as to its Federal income tax consequences; and (c)
provide defense in any administrative proceeding.

**ANSWER:**    Greenberg Traurig admits that it entered into a written Engagement

Letter with Lee and that Paragraph 82 accurately references the portion of the letter attached

as Exhibit 1 to the Complaint that states that Greenberg Traurig will (a) assist in structuring

the Tax Shelter Transaction; (b) render an opinion as to its Federal income tax consequences;

and (c) provide defense in any administrative proceeding, but Greenberg Traurig denies that

the referenced portion of Exhibit 1 accurately reflects the full meaning and context thereof,

1674222.1

and Greenberg Traurig refers to the entire content of Exhibit 1 for the full context and proper

meaning and effect of the portion of that letter referenced by Paragraph 82. The remaining

allegations in Paragraph 82 are legal conclusions to which a response from Greenberg

Traurig is neither necessary nor appropriate. To the extent that an answer is required,

Greenberg Traurig denies any remaining allegations of fact in Paragraph 82.

83.     GT acknowledges its duties to Plaintiffs by its references to the "Rules of
Professional Responsibility Governing the New York Bar" in the Tax Shelter Engagement
Letter. GT specifically acknowledges its duties with respect to conflicts of interest in the
same letter.

**ANSWER:**    Greenberg Traurig admits that the letter attached as Exhibit 1 to the

Complaint referenced the Rules of "Professional Responsibility Governing the New York

Bar," but Greenberg Traurig denies that the referenced portion of the letter accurately reflects

the full meaning and context thereof, and Greenberg Traurig refers to the entire content of the

letter for the full context and proper meaning and effect of the portion of that letter

referenced in Paragraph 83. Greenberg Traurig denies the remaining allegations in

Paragraph 83.

84.     In its capacity as attorneys for Plaintiffs, GT was obligated to use such skill,
prudence and diligence as well qualified members of the legal profession and were required
to act with the good faith and fidelity.

**ANSWER:**    The allegations in Paragraph 84 are legal conclusions to which a

response from Greenberg Traurig is neither necessary nor appropriate. To the extent that an

answer is required, Greenberg Traurig admits that the law imposes certain duties on

Greenberg Traurig as attorneys, as defined by the applicable governing law, and refers to that

law for the nature and extent of those duties. Greenberg Traurig denies any remaining

allegations of fact in Paragraph 84.

85.     Plaintiffs fully performed their obligations to GT under their contracts.

**ANSWER:**     The allegation in Paragraph 85 is a legal conclusion to which a response from Greenberg Traurig is neither necessary nor appropriate.  To the extent an answer is required, Greenberg Traurig denies the allegations of fact in Paragraph 85.

86.     GT ignored its obligations and instead provided Plaintiffs with advice that GT knew or should have known to be wrong in breach of the contracts between Plaintiffs and GT.

**ANSWER:**     Greenberg Traurig denies the allegations in Paragraph 86.

87.     Specifically, GT breached its contract with Plaintiffs and committed professional malpractice by: (1) representing that the Tax Shelter Transactions would be recognized by the IRS for tax purposes; (2) failing to disclose existing published authority, including the Notices published by the IRS, which advised that losses such as those generated by the Tax Shelter Transactions would not be allowed; (3) knowingly or negligently misrepresenting the effect of published guidance on the tax treatment of the Tax Shelter Transactions; and (4) failing to advise Plaintiffs at a later time that the representations in their Opinion Letter were false.

**ANSWER:**     Greenberg Traurig denies the allegations in Paragraph 87.

88.     GT knew or reasonably should have known their advice to be false.

**ANSWER:**     Greenberg Traurig denies the allegations in Paragraph 88.

89.     Upon information and belief, GT's Opinion Letter was a canned document used in part of a fee-generating scheme.

**ANSWER:**     Greenberg Traurig denies the allegations in Paragraph 89.

90.     As a result of GT's conduct as set forth herein, Plaintiffs have suffered injury, including, but not limited to: Lee paid the sum of $100,000 to GT for its advice related to the Tax Shelter Transactions and the Opinion Letter; Lee and NPF paid $1,455,935 in fees and costs associated with the Tax Shelter Transactions to the Bank, Delta, Bricolage, and other parties associated with Bricolage; Lee paid the sum of $632,307 in penalties to the IRS related to the Tax Shelter Transactions; Lee paid the sum of approximately $2,723,585 in interest to the IRS related to the Tax Shelter Transactions; Lee paid approximately $286,000 to the IRS to settle another matter, the settlement of which the IRS made a condition of its settling the Lee's liability related to the reporting of the Tax Shelter Transactions; and Lee,

1674222.1

NPF and LML have incurred in excess of $325,000 in additional legal and accounting fees related to the IRS' examination and settlement of the Tax Shelter Transactions.

**ANSWER:**    Greenberg Traurig admits that it received $100,000 on behalf of Lee.

Greenberg Traurig denies that Plaintiffs have suffered any injury or that Greenberg Traurig's

conduct has caused Plaintiffs any injury.  Greenberg Traurig lacks knowledge or information

sufficient to form a belief as to the truth of the remaining allegations in Paragraph 90, and

therefore denies those remaining allegations.

91.    As a direct and proximate cause of the foregoing, Plaintiffs have been injured in an amount in excess of $5.5 Million.

**ANSWER:**    Greenberg Traurig denies the allegations in Paragraph 91.

### Count VII - Breach of Contract/Professional Malpractice - Trust

92.    Plaintiffs repeat, re-allege, and incorporate the allegations contained in Paragraphs 1 through 44 as if fully set forth herein.

**ANSWER:**    Greenberg Traurig adopts and realleges its answers to Paragraphs 1-44

as though fully set forth herein.

93.    Plaintiffs entered into oral and written contracts with GT to provide Plaintiffs with professionally competent tax advice, legal services, to exercise the applicable standard of care, loyalty and honesty, and to comply with all applicable rules of professional conduct.

**ANSWER:**    Greenberg Traurig denies the allegations in Paragraph 93.

94.    GT acknowledges its duties to Plaintiffs by its references to the "Rules of Professional Responsibility Governing the New York Bar" in the Tax Shelter Engagement Letter. GT specifically acknowledges its duties with respect to conflicts of interest in the same letter.

**ANSWER:**    Greenberg Traurig admits that the letter attached as Exhibit 1 to the

Complaint referenced the Rules of "Professional Responsibility Governing the New York

Bar," but Greenberg Traurig denies that the referenced portion of the letter accurately reflects

the full meaning and context thereof, and Greenberg Traurig refers to the entire content of the

letter for the full context and proper meaning and effect of the portion of that letter

referenced in Paragraph 94. Greenberg Traurig denies the remaining allegations in

Paragraph 94.

95.    In its capacity as attorneys for Plaintiffs, GT was obligated to use such skill,
prudence and diligence as well qualified members of the legal profession and were required
to act with good faith and fidelity.

**ANSWER:**    The allegations in Paragraph 95 are legal conclusions to which a

response from Greenberg Traurig is neither necessary nor appropriate. To the extent that an

answer is required, Greenberg Traurig admits that the law imposes certain duties on

Greenberg Traurig as attorneys, as defined by the applicable governing law, and refers to that

law for the nature and extent of those duties. Greenberg Traurig denies any remaining

allegations of fact in Paragraph 95.

96.    Plaintiffs fully performed their obligations to GT under their contracts.

**ANSWER:**    The allegation in Paragraph 96 is a legal conclusion to which a

response from Greenberg Traurig is neither necessary nor appropriate. To the extent an

answer is required, Greenberg Traurig denies any allegations of fact in Paragraph 96.

97.    GT ignored its obligations and instead provided Plaintiffs with advice that GT
knew or should have known to be wrong and misleading in breach of the contracts between
Plaintiff and GT.

**ANSWER:**    Greenberg Traurig denies the allegations in Paragraph 97.

98.    Specifically, GT breached its contract with Plaintiffs, and committed
professional malpractice by: (1) drafting the Trust in such a manner as to generate for NPF
the lesser of the trust's income or 11.5% of the value of the trust as of the end of the
preceding year;, and (2) drafting the Trust in such a manner that it would never return at least
approximately 90% of the value of the assets contributed to Plaintiffs, as GT had represented
to Plaintiffs.

**ANSWER:**     Greenberg Traurig denies the allegations in Paragraph 98.

99.     GT knew or reasonably should have known their advice to be false.

**ANSWER:**     Greenberg Traurig denies the allegations in Paragraph 99.

100.     As a result of GT's conduct as set forth herein, Plaintiffs have suffered injury, including, but not limited to: Lee paid GT the sum of $20,000 for its advice and its preparation of the documents for the Trust; NPF contributed assets to the Trust of which at least $1,928,023 cannot be recovered from the Trust; and Lee, NPF and LML have and will incur legal and accounting fees related to the Trust in excess of $600,000 over the term of the Trust.

**ANSWER:**     Greenberg Traurig admits that it received $20,000 on behalf of Lee and that Lee, or an entity with which Lee was affiliated or which he controlled (such as NPF), contributed assets to the Trust.  Greenberg Traurig denies that Plaintiffs have suffered any injury or that Greenberg Traurig's conduct has caused Plaintiffs any injury.  Greenberg Traurig lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 100, and therefore denies those remaining allegations.

101.     As a direct and proximate cause of the foregoing, Plaintiffs have been injured in an amount in excess of $2.5 Million.

**ANSWER:**     Greenberg Traurig denies the allegations in Paragraph 101.

WHEREFORE, Greenberg Traurig denies that plaintiffs are entitled to any relief whatsoever and prays that this Court enter judgment in its favor, dismiss with prejudice the claims against it as set forth in the Complaint, and award such other relief as the Court deems just and proper.

## **AFFIRMATIVE DEFENSES**

Further answering the Complaint and as additional defenses thereto, Greenberg Traurig incorporates by reference the above answers as though fully set forth herein, without

1674222.1

assuming the burden of proof where such burden is otherwise on plaintiff as a matter of applicable substantive or procedural law, and states as follows:

### FIRST AFFIRMATIVE DEFENSE

Plaintiffs' claims against Greenberg Traurig are barred by the statute of limitations governing claims against attorneys and law firms.

### SECOND AFFIRMATIVE DEFENSE

The legal advice that Greenberg Traurig provided to Plaintiffs was an accurate summary of the law as it existed at the time the legal advice was requested and provided.

### THIRD AFFIRMATIVE DEFENSE

The legal advice that Greenberg Traurig provided to Plaintiffs was provided in good faith.

### FOURTH AFFIRMATIVE DEFENSE

Greenberg Traurig's acts or omissions were not the proximate cause of any alleged damages to Plaintiffs.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred by the doctrines of waiver, laches and estoppel.

### SIXTH AFFIRMATIVE DEFENSE

Plaintiffs' recovery of their alleged damages are barred to the extent that Plaintiffs have failed to mitigate their alleged damages.

### SEVENTH AFFIRMATIVE DEFENSE

The failure of Plaintiffs, who are educated, sophisticated clients, to question the draft and final documents clearly reflecting the terms of the Trust and related documents was an intervening proximate cause of their own alleged injuries.  If a defendant's alleged

negligence does nothing more than furnish a condition by which injury is made possible, that negligence is not the cause of the injury.

## **EIGHTH AFFIRMATIVE DEFENSE**

Plaintiffs' claims are barred by the doctrines of comparative and contributory negligence.

## **NINTH AFFIRMATIVE DEFENSE**

Greenberg Traurig was not the proximate cause of Plaintiffs' injury, if any, because the conduct of others, including without limitation, the Bank, Bricolage entities, Delta Currency Trading, and Grant Thornton, LLP, constitutes an intervening proximate cause.

Greenberg Traurig expressly reserves the right to amend or supplement its answer and plead additional affirmative and other defenses as they become known in the course of discovery.

WHEREFORE, defendant Greenberg Traurig respectfully requests that the Complaint be dismissed with prejudice, that Greenberg Traurig be dismissed with prejudice as a defendant, and that the Court grant such other relief as the Court deems just and appropriate.

Defendant Greenberg Traurig demands a trial by jury on all claims in the Complaint.

Respectfully submitted,

GREENBERG TRAURIG LLP


By: __/s/ David Jiménez-Ekman
        One of its Attorneys

Jeffrey D. Colman
David Jiménez-Ekman
Anne P. Ray
JENNER & BLOCK LLP
330 N. Wabash Avenue
Chicago, Illinois 60611
(312) 222-9350

Dated:  July 14, 2008

1674222.1